IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KEN F. LEVIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-CV-00767 |
| | ) | |
| ALEXANDER GRECIAN, | ) | Judge Gary Feinerman |
| | ) | |
| Defendant. | ) | Magistrate Judge Geraldine Soat Brown |

**PLAINTIFF'S MEMORANDUM IN SUPPORT
OF HIS MOTION FOR SUMMARY JUDGMENT**

Stephen Novack
Timothy J. Miller
Richard L. Miller II
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, IL 60606
(312) 419-6900

Plaintiff Ken F. Levin ("Levin"), by his attorneys, pursuant to Fed. R. Civ. P. 56, submits this Memorandum in Support of his Motion for Summary Judgment (the "Motion") on Count I of Plaintiff's Complaint and on the Counterclaim of Defendant Alexander Grecian ("Grecian"). If the Motion is granted, Count II of the Complaint will be moot.

## SUMMARY OF ARGUMENT

Grecian admits that in 2004 he entered into a written contract (the "Agreement") that provides that Levin "shall have an interest of 15%" in any novels Grecian authors. In December 2011, just before Grecian was to receive his first payment on a publishing contract for his novel *The Yard* with a minimum of $500,000 guaranteed, Grecian claimed that Levin had breached the Agreement, declared it terminated and refused to pay Levin his 15%. Grecian argues that Levin breached the Agreement by: (a) not selling any of Grecian's works; (b) not formulating strategies to do so; (c) not keeping Grecian informed; and (d) not getting Grecian's approval to option a work authored by Grecian.

As shown below, Levin is entitled to summary judgment on Count I of his Complaint because the undisputed facts show that: (a) the Agreement does not require Levin to complete a sale to be entitled to his interest; (b) Levin did form the strategies resulting in the sale of *The Yard*; (c) Levin kept Grecian informed via telephone calls and hundreds of e-mails; and (d) Levin did not improperly option any of Grecian's works. Levin is entitled to summary judgment on Counts I, III and IV of the Counterclaim for those same reasons and on Count II thereof because there is no evidence that any purported breach of fiduciary duty caused any damages.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The following facts are undisputed:

**A.    Grecian Solicits Levin**

On August 19, 2004, Grecian sent Levin an e-mail stating: "You don't know me, but William Harms mentioned you in an interview published in Write Now Magazine." (Stmt. ¶ 5)[1] In that e-mail, Grecian asked for advice as to a call that he might receive regarding his proposal for a work he had entitled *The Impossible Snowman*, stating "I realize that you have a number of high-profile clients and I don't know if you are able or willing to take on relative unknowns, but I could certainly use some advice." (Id.)

**B.    The Agreement**

Grecian and Levin entered into the Agreement as of November 1, 2004. (Id. ¶ 7.) Pursuant thereto, Levin agreed to advise Grecian and negotiate on his behalf as to the literary and comic art properties that Grecian might write. In return, Grecian granted Levin, among other things, a 15% interest in any novels (or their sequels) that Grecian might write during the term of the Agreement. (Id.) The only written agreement between Grecian and Levin is the Agreement. It was never orally modified. (Id. ¶ 8.)

**C.    Levin Commences Performance Under The Agreement**

After the Agreement took effect, Grecian and Levin worked together, having contact on a regular basis by both telephone and e-mail. (Id. ¶¶ 9-11.) Levin and Grecian talked about projects that Grecian was considering and whether, if completed, they could be sold. (Id. ¶ 10.) Between October 2004 and December 2011, Grecian and Levin exchanged approximately 781 e-mails, of which approximately 271 were sent from Levin to Grecian. (Id. ¶ 11.)

---

[1] Levin's Statement of Facts pursuant to Local Rule 56.1 is filed contemporaneously herewith and cited herein as "Stmt. ¶ ___."

2

D.     **Levin Promotes Grecian And His Works**

Beginning in or around 2007, Grecian authored a series of comic books entitled *Proof*. (Id. ¶ 12.) Levin contacted various entities and individuals to get *Proof* promoted and to have it developed for television. These contacts included Sony, the Spike network, Whoopi Goldberg, Samuel L. Jackson, Jason Netter ("Netter"), Samantha Olsen ("Olsen") and the development company at which Netter and Olsen worked, Kickstart Entertainment. (Id. ¶ 13.) As recently as February 2010, Levin attempted to help Grecian sell *Proof's* foreign publishing rights. (Id. ¶ 14.)

E.     **Levin And Fishman Embark On The Joint Initiative**

In early 2010, Levin embarked on a "joint initiative" with a third-party, Seth Fishman ("Fishman"). (Id. ¶ 15.) Pursuant to this initiative, Levin and Fishman formed a "collaboration" to present a "graphic [novel] initiative to an exclusive group of trade publishers" that would include the work of several authors. (Id.) Levin traveled to New York to discuss the initiative with Fishman. (Id. ¶ 16.) Afterward, Fishman acknowledged the initiative with enthusiasm, stating, "I know you're partnering-up with someone of much less experience, but I'm glad you did -- I've high hopes for all this." (Id. ¶ 17.) As of the date of Fishman's deposition, Levin had spoken to publishers more than Fishman. (Id. ¶ 18.)

F.     **Levin Introduces Grecian To Fishman**

In 2010, Levin introduced Grecian's works to Fishman. (Id. ¶ 19.) Fishman was then working as an assistant literary agent at the Sterling Lord literary agency. (Id. ¶ 20.) He had a mixed role. His duties included secretarial work, such as answering phones, typing correspondence and scheduling meetings. (Id. ¶ 21.) Fishman also had some agent duties, such as reading and sending out submissions from authors. (Id.)

3

Levin promoted Grecian by speaking favorably of him to Fishman and suggesting that Grecian's work be included in the pitches Levin and Fishman were planning to make together to New York publishers. (Id. ¶ 22.) Levin forwarded *Proof* and Grecian's most recent drafts of two unpublished prose novels to Fishman. (Id. ¶ 23.) Thereafter, Grecian agreed, in a conversation with Levin, that Fishman would serve as Grecian's literary agent. (Id. ¶ 27.) Levin was excited about this, indicating to Grecian that it was a "good opportunity" for Grecian. (Id.)

G.  *The Yard*

Levin suggested to Fishman that Grecian's idea for a graphic novel -- to be entitled "*The Yard*" -- be included in the New York pitches.[2] (Id. ¶ 24.) Fishman agreed. (Id. ¶ 25.) Levin -- not Fishman -- worked on the proposal for the graphic novel that was to be *The Yard*. (Id. ¶ 26.)

H.  **Levin Pitches *The Yard* On Behalf Of Grecian**

In early 2010, as he and Levin had agreed, Fishman scheduled joint initiative pitch meetings with three New York publishers: (a) Del Ray / Random House, (b) Yen Press / Hachette Book Group; and (c) Tor /Macmillan. (Id. ¶¶ 29- 30.) Levin flew to New York to pitch at the meetings. (Id. ¶ 31.) All of the authors whose works were promoted at the meetings were originally the clients of Levin, not Fishman. (Id. ¶ 32.)

At the meetings, Levin took the lead and provided the majority of the content. (Id. ¶ 33.) Levin spoke favorably and enthusiastically about *The Yard* at all three meetings. (Id. ¶ 34.)

I.  **Levin Convinces Grecian To Write *The Yard* As Prose**

After the New York meetings, Levin came up with the idea that Grecian write *The Yard* as a prose -- rather than graphic -- novel. (Id. ¶ 35.) Levin conveyed this idea to Fishman and

---

[2] A graphic novel is a narrative work in which the story is conveyed using art -- as is done with comic magazines – with dialogue usually in "word balloons." However, graphic novels are typically bound in longer and more durable formats than comic magazines.

Fishman agreed. (Id.) Levin reported to Grecian on the New York publisher meetings and conveyed his idea that *The Yard* be written as a prose novel instead. (Id. ¶ 36.) At first, Grecian was hesitant to do so, but he ultimately agreed to write *The Yard* as a prose novel, and as he did, Levin provided him with written and oral feedback on it. (Id. ¶¶ 37-38.)[3]

### J. Levin Convinces Grecian Not To Sell *The Yard* For $10,000

In August 2010, Grecian and Levin agreed to send the first 168 pages of *The Yard* (it was not then finished) to John Schoenfelder ("Schoenfelder"), editor of Little Brown's new Mulholland Books imprint. (Id. ¶ 40-41.) Schoenfelder read those pages and sent Levin an e-mail, with a cc to Fishman, stating, "The pages are AMAZING." (Id. ¶ 41.) Levin forwarded this e-mail to Grecian who responded to Levin, with a cc to Fishman, stating, "Ha! Thank you, gentlemen! I'm raising a glass to you. Cheers!" (Id. ¶ 42.) Then, Little Brown's Mulholland Books imprint conveyed an offer on *The Yard* to Levin, who passed it along to Grecian. (Id. ¶ 43.) Although the offer was for only $10,000, Grecian wanted to accept it. (Id. ¶ 44.) Levin did not think that Grecian should do so. (Id.) Levin told Grecian (correctly, as it turned out) that if he (Grecian) completed the *The Yard* manuscript it would actually sell for far more than $10,000. (Id. ¶ 45.) As a result, the $10,000 offer was not accepted by Grecian. (Id.)

### K. Grecian Apologizes For Causing Delays

On December 3, 2010, Grecian sent an e-mail to Levin and Fishman, in which he apologized for being "incommunicado" about *The Yard* and stated, "You've both been encouraging and helpful and I didn't mean to put you off." (Id. ¶ 46.) During this period, Levin provided Grecian further feedback on drafts of *The Yard*. (Id. ¶ 47.) On March 29, 2011,

---

[3] In May 2010, Levin and Fishman also repeatedly provided feedback to Grecian on drafts of portions of other works, including one called *Paradise Flats*. (Id. ¶ 43.)

5

Grecian sent an e-mail attachment to Levin and Fishman stating: "I am grateful beyond words for your faith and interest in my career." (Id. ¶ 48.)

L.      *The Yard* **Is Sold For $500,000**

In May 2011, Grecian completed his first draft of *The Yard*. (Id. ¶ 53.) That draft was sent to a pre-agreed list -- created by Fishman and approved by Levin -- of 13 editors at high-end publishers. (Id. ¶ 50.) On May 10, 2011, in an e-mail to Levin, Grecian stated, "I think all three of us have good reason to feel pretty damn proud of ourselves right now." (Id. ¶ 51.) Levin, Fishman and Grecian then had a call in which they discussed an upcoming auction for the publishing rights to *The Yard*. (Id. ¶ 52.) On May 12, 2011, Fishman conducted the auction and provided updates on its progress to Levin via e-mail and telephone. (Id. ¶ 53.)

After the auction, Grecian, Levin and Fishman discussed which auction offer to accept. (Id. ¶ 54.) Putnam Publishing's offer was $500,000, as a guaranteed advance, for the North American publishing rights for *The Yard* and a future sequel. (Id. ¶ 55.) Levin and Fishman both recommended that Grecian accept that offer. (Id. ¶ 56.) Grecian did so. (Id.)

On May 16, 2011, Grecian e-mailed Fishman, stating: "You and Ken did good by me and I have a long memory." (Id. ¶ 57.) As Grecian later explained it, he meant that: "[Levin and Fishman] had both been instrumental in agenting for me, selling the novel." (Id.)

The contract between Grecian and Putnam needed to be finalized. Levin provided advice and commentary relating to the contract negotiations. (Id. ¶ 58.) Fishman described Levin's initial notes on the contract as, "Perfect." (Id. ¶ 59.) Levin also reviewed and provided input, on Grecian's behalf, on contracts for the foreign publishing rights to *The Yard*. (Id. ¶ 60.)

M.  **Grecian, Levin And Fishman Hold A Strategy Meeting**

In July 2011, Grecian met with Levin and Fishman in San Diego at a Comic-Con convention. (Id. ¶ 61.) The three discussed the book deal for *The Yard*, possible future deals and strategies for releasing the two other novels Grecian had previously authored. (Id. ¶ 61-62.)[4]

N.  **Grecian Is Anxious To Get Paid**

On September 13, 2011, Levin updated Grecian on the status of the Putnam contract negotiations. (Id. ¶ 65.) On September 27, 2011, Grecian wrote Levin that he was anxious to be paid. (Id. ¶ 67.) On September 29, 2011, Levin provided to Fishman and his agency's contracts lawyer extensive notes in response to the latest Putnam contract draft. (Id. ¶ 68.) On October 4, 2011, Levin wrote Grecian that Fishman's agency's contracts lawyer was finding out when a final draft contract would be generated by Putnam. (Id. ¶ 69.) Grecian wrote back that same day saying "Thank you Ken. I really appreciate it. They're flying me out to NY next Wednesday to meet me. I'll let you know how it goes." (Id.)

O.  **Grecian Fires Levin**

On December 21, 2011, as the final version of the Putnam contract was being readied, Grecian's lawyer accused Levin of having "utterly failed to perform" under the Agreement, and declared the Agreement terminated. (Id. ¶ 71.) Grecian has not compensated Levin anything for his 15% interest in *The Yard* pursuant to the Agreement. (Id. ¶ 73.)

P.  **In Contrast To His Lawyer's Letter, Grecian Approved Of Levin's Performance**

In contrast to the accusation by Grecian's lawyer that Levin "utterly failed to perform," Grecian repeatedly expressed in writing his satisfaction with Levin's work. For example, on

---

[4] Levin and Fishman were at "polite odds" as to how to proceed with respect to those two books. (Id. ¶ 62.) Levin recommended going with a different publisher for those books, but Fishman wanted to take them to Putnam Publishing. (Id. ¶ 63.)

February 1, 2010, more than five years after entering into the Agreement, Grecian wrote that he planned to stay with Levin even after the Agreement expired. (Id. ¶28.) Indeed, on September 4, 2011 -- only a few months before he fired Levin -- Grecian recommended that a writer-friend of Grecian's, Jai Nitz, hire Levin to represent him. (Id. ¶ 64.) In fact, though *The Yard* was released after he fired Levin, Grecian wrote in the "Acknowledgements" page (which appears in every published copy of the book):

> Writing *The Yard* has been the most challenging, and the most rewarding, creative experience of my life and it could not have been accomplished without the support and encouragement of an abundance of good Samaritans. **I owe many people a profound debt:**
>
> My agents, Seth Fishman at The Gernert Company and **Ken Levin at NightSky, for talking me into writing this novel in the first place and then championing it beyond the call of duty.** . . .

Id. ¶ 74 [emphasis added].

## ARGUMENT

If the record shows there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law," summary judgment must be entered. Fed. R. Civ. P. 56(a). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Further, the non-moving party must produce more than a scintilla of evidence in support of its position. Id. at 252. Rather, there must be "evidence on which the jury could reasonably find" for the non-moving party. Id.

Here, as shown below, Levin has produced ample evidence in his favor, and Grecian cannot produce any evidence that would enable a jury to "reasonably find" in his favor. Id.

A. **Levin Prevails On Count I Of His Complaint**

To establish a breach of contract claim, a plaintiff must show the existence of a contract, breach by the defendant and damages to the plaintiff as a consequence. *Thilman & Co. v.*

8

*Esposito*, 408 N.E.2d 1014, 1020 (1st Dist. 1980). Here, Grecian admits the existence of the Agreement and that he has refused to pay Levin. The fact that Levin has been damaged is undeniable given that Grecian has refused to pay Levin the 15% to which he is entitled pursuant to Paragraph 6(B) of the Agreement with respect to the sales of *The Yard*. (Stmt. ¶73.)

### B.     Grecian's Defenses To Count I Fail

In accordance with Fed. R. Civ. P. 9(c), Levin alleged in his Complaint that he performed all conditions precedent under the Agreement. (Stmt. Tab 1, ¶ 29.) And, as detailed above, the uncontested facts prove that Levin performed the Agreement. Among other things, Levin regularly communicated with Grecian, promoted Grecian and worked to get *Proof* developed, brought Grecian's work into his joint initiative with Fishman, pitched *The Yard*, advised Grecian to write *The Yard* as a prose novel, advised and convinced Grecian not to undersell *The Yard* (for $10,000, which Grecian wanted to accept), and participated in the process and negotiations that ultimately garnered Grecian $500,000 just for North American rights to *The Yard* and a sequel.

In violation of Rule 9(c), Grecian failed to state with particularity in his Answer how he believes Levin failed to perform under the Agreement. (Id.) Nevertheless, Grecian's affirmative defenses allege nonperformance. As set forth below, those defenses fail.

#### 1.     First Affirmative Defense

Grecian's first affirmative defense alleges that: "Levin's claims are barred by his own material breaches of the Agreement, which excused Grecian from any obligations under the Agreement." (Id., p. 11, ¶ 1.) Levin served an interrogatory asking Grecian to identify "all of the provisions of the Agreement that you contend Plaintiff violated[.]" Grecian responded with four allegations. (Stmt. ¶ 75.)

First, Grecian stated: "Mr. Levin agreed in Paragraph 1 of the Agreement to be my agent, but he failed to effectively represent me, a fact best demonstrated by the fact he never sold a single one of my works during seven years, while Mr. Fishman sold The Yard for $500,000 in less than a year." (Id.) This fails because Paragraph 1 of the Agreement does not oblige Levin to complete the sale of any works. It states: "Alex hereby acknowledges that as of the Effective Date set forth above, Ken F. Levin ('Ken') has agreed to be attached to the Properties and that Alex has designated Ken as the sole and exclusive representative of all of the rights to the Properties." (Stmt. Tab 6, ¶ 2.)

Beyond the clear language of the Agreement, the uncontested facts detailed in the Undisputed Facts section above establish that Levin was instrumental in selling *The Yard*. It is undisputed that, among other things, Levin: brought Fishman onto Grecian's team, pitched *The Yard*, convinced Grecian to write *The Yard* as a prose novel, convinced Grecian not to sell it for $10,000, participated in the process resulting in the sale of *The Yard* for $500,000 and was involved in drafting the contract for its sale. Grecian cannot be allowed to fire Levin on the eve of finalizing the sale and then contend that he did not complete that sale.

Second, Grecian stated: "In Paragraph 2, Mr. Levin agreed to formulate strategies to develop my Properties, but he never did so. The 'strategy' for selling The Yard was developed by Mr. Fishman." (Stmt. ¶ 75.) This goes nowhere because it is uncontested that Levin developed the strategies of: (a) creating the "joint initiative" with Fishman; (b) including *The Yard* in the "joint initiative" pitches; (c) how to present *The Yard* at the New York pitch meetings; (d) writing *The Yard* as prose rather than a graphic novel; and (e) refusing the $10,000 offer for an incomplete version of *The Yard* and instead offering it for sale when it was completed in order to obtain a higher price.

Third, Grecian stated, "In Paragraph 3, Mr. Levin agreed to keep me informed, but he did not do so. Instead, he regularly failed to respond to e-mails." (Stmt. ¶ 75.) Yet, Paragraph 3 does not require a response to every e-mail. It states: "Ken and Alex shall keep each other informed of any and all inquires and discussions respecting the Properties and the rights to the Properties. Each agrees to let the other know of any inquiries and any potential or actual opportunities learned of when received[.]" (Id. Tab 6.) In addition to their telephone and other contacts (Stmt. ¶ 10), between October 2004 and December 2011, Grecian and Levin sent approximately 781 e-mails to each other. Of those, approximately 271 were from Levin to Grecian. (Id. ¶ 11.)

In all events, even if Grecian was not kept properly informed (he was), he waived any such defense by continuing to utilize Levin's services with respect to *The Yard*. *See, e.g., Siegel v. Samsung Elec. Am., Inc.*, No. 85 C 9193, 1987 WL 8193, *2 (N.D. Ill. Mar. 13, 1987) (granting summary judgment on breach of contract claim, finding that "plaintiff continued to recognize the contracts' existence after learning of the alleged breaches thereof by continuing to accept performance of the contracts and by receiving commissions thereunder, thereby waiving any alleged breaches" by defendant).

Fourth, Grecian stated, "In paragraph 4, Mr. Levin agreed [to] get my approval, but he did not do so. For example, he claimed to have optioned The Yard to Sony without telling me for two weeks. He also rejected the offer from the new imprint of Little Brown for The Yard without getting my approval." (Stmt. ¶ 75.) This completely fails on the uncontested record.

As to Sony, Grecian has not come forward with any evidence supporting the contention that Levin gave an "option," much less did so without his approval. With respect to Little Brown's Mulholland imprint, which offered the $10,000 Grecian ultimately rejected, Paragraph

11

4 does not address the rejection of offers. It says only that: "No agreement for any of the Rights to the Properties or for any Services shall be entered into unless expressly approved by Alex in advance." (Stmt. Tab 6.)

Finally, there was and could be no material breach by Levin with respect to the allegedly unauthorized rejection of the $10,000 Little Brown Mulholland offer for *The Yard*. After all, *The Yard* was later sold for $500,000! See *M.S. Distrib. Co. v. Web Records, Inc.*, No. 00 C 1436, 2003 WL 21087961 at *8 (N.D. Ill. May 13, 2003) (affirmative defense of breach of contract requires proof of material breach, which requires a breach and consequential damages).

*Spectrum Systems, Inc. v. Eng*, No. 08 C 6647, 2010 WL 3526520 (N.D. Ill. Sept. 1, 2010), is particularly instructive in defeating Grecian's first affirmative defense. There, Spectrum Systems' president, Eng, claimed that he was entitled to compensation pursuant to his employment contract. In response, Spectrum Systems alleged that Eng breached the contract by failing to: (a) devote sufficient time and effort to develop new customers; and (b) adequately perform his duties. Id. at *6. The court entered summary judgment for Eng, stating, "Although the 2006 Agreement contains specific provisions regarding Eng's compensation, it does not contain any specific quotas related to the amount of business that Eng was expected to bring into the company, nor does it provide that Eng was required to work on a full-time schedule or that he was not allowed to have substantial outside commitments." Id. at *7.

Here, Levin provided a vast amount of services to Grecian and, like Eng in *Spectrum Systems, Inc.*, violated no specific requirements of his contract. Accordingly, Levin is likewise entitled to summary judgment as to liability.

2.  **Second Affirmative Defense**

Defendant's second affirmative defense is that, "Levin's claims are barred by his agreement to act as a co-agent with The Gernert Company and to accept 5% of the sales from 'The Yard' and its sequel in full satisfaction of any and all obligations Grecian otherwise had under the Agreement." (Stmt. Tab 1, ¶ 2.) This defense fails because, as Grecian admits: (a) there is no written agreement between Grecian and Levin except for the Agreement (Stmt. ¶ 8.); and (b) the Agreement was never orally modified. (Id.)

3.  **Third Affirmative Defense**

Defendant's third affirmative defense is that: "Levin's claims are barred by the doctrines of waiver and/or estoppel as a result of Levin's agreement to act as a co-agent with The Gernert Company and to accept 5% of the sales from 'The Yard' and its sequel in full satisfaction of any and all obligations Grecian otherwise had under the Agreement." (Stmt. Tab 1, ¶ 3.) Once again, Grecian's defense fails because, as Grecian admits: (a) there is no written agreement between Grecian and Levin except for the Agreement (Stmt. ¶ 8.); and (b) the Agreement was never orally modified. (Id.)

Moreover, for estoppel to apply Grecian must demonstrate that Levin misrepresented or concealed material facts; Levin knew the misrepresentations were untrue when they were made; and Grecian reasonably relied upon the representations in good faith to his detriment. *Geddes v. Mill Creek Country Club, Inc.*, 751 N.E.2d 1150, 1157 (Ill. 2001) *cert denied*, 122 S. Ct. 646 (Ill. 2001). Yet, there is no evidence that any misrepresentation was made to Grecian, that any material facts were concealed from him or that Grecian relied to his detriment on any such misrepresentation or concealment. Hence, the defense fails for those reasons as well. See., *Anderson, supra*, 477 U.S. at 252.

13

C.     **Levin Prevails On Grecian's Counterclaim**

Grecian's counterclaim contains four counts. (Stmt. Tab 1.) Three counts (I, III and IV) essentially mirror his affirmative defenses and Levin should be granted summary judgment for the reasons discussed at length above, including lack of damages. *See, e.g., Universal Mfg. Co. v. Gardner, Carton & Douglas*, 207 F. Supp. 2d 830, 834 (N.D. Ill. 2002) (on breach of contract claim, summary judgment in favor of defendant appropriate when there is no evidence plaintiff suffered damages).

Count II asserts that Levin breached an alleged fiduciary duty owed to Grecian. (Stmt. Tab 1.) Levin should be granted summary judgment on Count II because Grecian has admitted that he suffered no damages as a result of Levin's purported breach and/or because Grecian cannot prove that he suffered any damage as a result of Levin's purported breach. Damage is an essential element of a claim for breach of fiduciary duty. *Bank of America, N.A. v. Carpenter*, 401 Ill. App. 3d 788, 801, 929 N.E.2d 570, 582-83 (1st Dist. 2010) (granting summary judgment on breach of fiduciary duty counterclaim for failure to establish damages).

The Counterclaim alleges three purported breaches at paragraphs 32 through 34. Grecian admits that he suffered no damage with respect to purported alleged attempts (¶ 32) to make Levin a co-writer on Grecian's projects. (Stmt. ¶76.) And Grecian has produced no evidence of any damage for breaches alleged at paragraphs 33-34. Nor did he identify an expert to quantify any damage of any sort. Thus, summary judgment should be entered in favor of Levin. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (complete failure of proof as to essential element of nonmoving party's case is grounds for summary judgment).

14

## CONCLUSION

Based on the foregoing, Levin respectfully requests that the Court issue an Order entering summary judgment in favor of Levin and against Grecian on Count I of the Complaint and on the Counterclaim, awarding Levin the relief prayed for in his Complaint and granting Levin such other and further relief as is appropriate.

                                            KEN F. LEVIN

                                            By:   /s/ Richard L. Miller II
                                                           One of His Attorneys

Stephen Novack
Timothy J. Miller
Richard L. Miller II
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, IL 60606
(312) 419-6900
Doc #558475

## CERTIFICATE OF SERVICE

Richard L. Miller II, an attorney, certifies that he caused copies of the foregoing to be served by electronically filing the document with the Clerk of Court using the ECF system this 15th day of February 2013.

/s/ Richard L. Miller II