UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KEN F. LEVIN, | ) | |
| | ) | |
| Plaintiff, | ) | 12 C 767 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| ALEXANDER GRECIAN, | ) | |
| | ) | |
| Defendant. | ) | |

**M**EMORANDUM **O**PINION AND **O**RDER

Ken Levin, a literary agent, brought this suit in the Circuit Court of Cook County,

Illinois, against his former client, author Alex Grecian. Count I of the complaint seeks a

declaratory judgment that Levin's and Grecian's representation agreement ("Agreement") is a

valid and enforceable contract and that Grecian owes Levin 15 percent of the money that Grecian

received for the rights to publish his novel *The Yard*, a New York Times bestseller, and its

forthcoming sequels, the first of which, *The Black Country*, was released earlier this month;

Count II rests on the same factual predicate and seeks damages for anticipatory breach of

contract. Doc. 1-2; Doc. 68 at ¶ 114. After removing the suit to this court, Doc. 1, Grecian

answered and filed counterclaims, Doc. 8. Count I of the counterclaims alleges that Levin

breached the Agreement and seeks damages; Count II alleges that Levin breached fiduciary

duties owed to Grecian and seeks damages; Count III seeks a declaratory judgment that Levin's

alleged breach of the Agreement terminated Grecian's obligations thereunder, including any

obligation to pay Levin a commission; and Count IV seeks, in the alternative to Count III, a

declaratory judgment that Levin is entitled at most to only a 5 percent commission as the "co-

agent" of Seth Fishman, whose role in the parties' dispute is set forth below. Doc. 8 at pp. 15-

17.  The parties have agreed to try the case to the bench, with trial set to commence on October 7, 2013.  Doc. 49.

Levin has moved for summary judgment on Count I of his complaint and on each of Grecian's counterclaims.  Doc. 56.  The motion is granted in part and denied in part.  Summary judgment is granted to Levin as to Grecian's counterclaims for breach of contract and breach of fiduciary duty.  But Levin's declaratory judgment claim and Grecian's declaratory judgment claims (the first of which mirrors Levin's declaratory judgment claim) shall proceed to trial along with the claim in Count II of Levin's complaint.

## Background

The following facts are stated as favorably to Grecian, the non-movant, as the record and Local Rule 56.1 allow.  *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012).  In considering Levin's motion for summary judgment, the court must assume the truth of those facts, but it does not vouch for them.  *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

Before proceeding, the court notes that Levin's unauthorized reply to Grecian's Local Rule 56.1(b)(3)(B) response to Levin's Local Rule 56.1(a)(3) statement misunderstands the local rules.  Doc. 68 at 1-34.  Where Grecian's Local Rule 56.1(b)(3)(B) response denies Levin's Local Rule 56.1(a)(3) assertions of material fact, Grecian includes brief factual statements to support the denials, with citations to relevant portions of the record.  Over and over, and citing *Miller v. Ameritech Corp.*, 2005 WL 2266614, at *1 (N.D. Ill. Sept. 14, 2005), Levin complains of these responses with the boilerplate assertion that "Grecian's response … should be deemed an admission and the excess information and argument contained within it should be stricken.  The party responding to a 56.1 statement may <u>not</u> include additional facts in its response to the movant's statement of material fact."  *E.g.*, Doc. 68 at ¶ 8.  Levin badly misreads *Miller*, which

use the phrase "additional facts" in the sense meant by Local Rule 56.1(b)(3)(C), which requires the party opposing summary judgment to submit "a statement … of any additional facts that require the denial of summary judgment."  In that context, the phrase "additional facts" does not mean *all* facts other than the facts asserted by the movant's Local Rule 56.1(a)(3) statement, but rather only those additional facts that are not intended to show that the movant's asserted facts are disputed.  Local Rule 56.1(b)(3)(B) provides that the non-moving party *should* offer factual responses, along with record citations supporting those responses, that controvert the movant's statements of fact, and that the non-movant must limit those factual responses to facts that are indeed responsive to the movant's assertion—that is, to facts that fairly contradict what the movant has actually asserted.  If the non-movant wants to assert facts that go beyond what is fairly responsive to the movant's factual assertion, then he must do so not in his Local Rule 56.1(b)(3)(B) response, but in his "statement … of any additional facts that require denial of summary judgment" under Local Rule 56.1(b)(3)(C).  *See Johnson v. Cnty. of Cook*, 2012 WL 2905485, at *12 (N.D. Ill. July 16, 2012) ("It is inappropriate for a non-movant to include additional facts, *meaning facts extraneous to the substance of the paragraph to which the non-movant is responding*, in a Local Rule 56.1(b)(3)(B) response.  Rather, Local Rule 56.1 *requires specifically* that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate statement under Local Rule 56.1(b)(3)(C) of any additional facts that require the denial of summary judgment.") (first emphasis added, citations and internal quotation marks omitted).  The line between a responsive fact that should be included in a Local Rule 56.1(b)(3)(B) response and an extraneous fact that must be stated in a Local Rule 56.1(b)(3)(C) statement is not always bright, and a number of Grecian's responses hover around that line and even cross it.  *E.g.*, Doc. 64 at ¶¶ 23, 61.  But Levin replies with the boilerplate quoted above

even where Grecian's responses do not even approach that line, *e.g.*, Doc. 68 at ¶ 10, indicating that Levin misunderstands the purpose of a Local Rule 56.1(b)(3)(B) response. The court will adhere to the local rules; it will ignore extraneous matter in Grecian's Local Rule 56.1(b)(3)(B) responses, but will take account of facts included in those responses that are relevant to showing that Levin's Local Rule 56.1(a)(3) assertions are genuinely disputed.

Levin and Grecian's relationship began in August 2004, when Grecian sent Levin an email seeking advice about a proposal Grecian expected to receive regarding his work "The Impossible Snowman." Doc. 64 at ¶ 5. The two exchanged several emails and ultimately entered into the Agreement, which has an effective date of November 1, 2004. *Id.* at ¶¶ 6-7. Levin was impressed by Grecian's work and admits that Grecian was the only client in Levin's 39-year career that Levin took on without a referral. Doc. 68 at ¶ 78. The Agreement made Levin "the sole and exclusive representative of all of the rights to the Properties," with "Properties" defined to mean the novels, graphic novels, and other comic art works "which are or have been created or controlled by Alex Grecian in whole and in part as of and after the Effective Date [of the Agreement] and all sequels and spin-offs of same." Doc. 58-6 at 2. Levin agreed to "work with [Grecian] to formulate strategies to develop and 'take out' Properties for print publication, movie, television, and/or video game development." *Id.* at 2-3. In return, the Agreement provided that Levin "shall have an interest of 15% in any non-comic art writing or print publication (novels, screenplays, etc.), and in third party print publishings of comic art Properties." *Id.* at 4. The Agreement's initial term was seven years, ending November 2011, and it provides for automatic renewal for additional four-year periods unless Grecian sends a notice of termination to Levin "at least six months before the end of the Term." *Id.* at 5-6. The Agreement is and was the only contract between Levin and Grecian. Doc. 64 at ¶ 8.

Between October 2004 and December 2011, when Levin and Grecian's relationship came to an end, the two exchanged approximately 781 emails, of which 271 were sent by Levin. *Id*. at ¶ 11. Around 2007, Grecian authored a series of comic books called *Proof*; the series was published that same year. *Id*. at ¶ 12. Levin claimed to have pitched the idea of a television series or movie based on *Proof* to Sony, the Spike television channel, Whoopi Goldberg, Samuel L. Jackson, and the principals of a development company called Kickstart Entertainment. *Id*. at ¶ 13. The proposed deal would have paid Levin $45,000 to $75,000 per year to act as a "passive producer." Doc. 68 at ¶ 110. Grecian believes that Levin was willing to offer *Proof* only to potential producers who would pay Levin such a fee, and that this led the producers to reject the proposal. *Id*. at ¶ 112. No television series ever materialized, and Grecian received no money from Levin's efforts. *Id*. at ¶ 111. Several times during their relationship, Levin suggested to Grecian that they should co-write something together; Grecian did not accept these proposals, but he admits that he was not harmed by them. Doc. 64 at ¶ 76. Until some six-and-a-half years into the parties' relationship, when *The Yard* was finished and sold to a publisher in mid-2011, Levin never sold any of Grecian's works. Doc. 68 at ¶ 83. The parties dispute the extent to which the sale of *The Yard* was attributable to Levin's efforts; the court expresses no view on that point.

In early 2010, Levin and another literary agent, Seth Fishman, agreed to undertake a "joint initiative" to create a graphic novel comprised of several authors' works and to promote it to publishers. Doc. 64 at ¶¶ 15-17, 20-21. Levin introduced Fishman to Grecian's works, and Levin and Fishman decided to pitch Grecian's idea for a graphic novel called *The Yard* to publishers in New York. *Id*. at ¶¶ 19, 22-25, 29-32. At Levin and Fishman's meetings with the publishers, Levin took the lead in presenting the material and spoke favorably and

enthusiastically about *The Yard*. *Id*. at ¶¶ 33-34. After the meetings, Levin came up with the idea that Grecian should write *The Yard* as a regular prose novel rather than as a graphic novel; Levin and Fishman jointly proposed this to Grecian, who agreed. *Id*. at ¶¶ 35, 37. As Grecian wrote *The Yard*, Levin and Fishman provided him with feedback on his drafts, but the parties disagree about how substantive and helpful Levin's feedback was; Grecian testified at deposition, and the court accepts for purposes of this motion, that the feedback was in "the nature or typos and such" rather than addressing plot or style. *Id*. at ¶ 38.

Levin referred to Fishman as his "co-agent for THE YARD." Doc. 68 at ¶ 85. In October or November 2011, Levin sent Fishman a letter that suggested a split between them of the 15 percent commission for *The Yard*:

> In respect of generated fees [o]f publishing revenues (all manners, formats, media and languages), our agreement is that … you [Fishman] are entitled to Ten (10%) Percent of the gross amount of each "Advance" and under the agreement as and between us, NightSky [Levin's agency] shall receive Five Percent (5%).

*Id*. at ¶ 87. Levin testified at deposition that had this provision gone into effect between himself and Fishman, Fishman would receive two-thirds of Fishman's typical 15 percent literary agent fee (that is, 10 percent) and Levin would receive one third (5 percent), and that Levin would apply that 5 percent against the 15 percent that Grecian owed him under the Agreement, with the result that Grecian would pay a 25 percent commission: 10 percent to Fishman and 15 percent to Levin. *Ibid*. Fishman responded later in November, and instead of accepting Levin's proposal, he asked Levin to confirm that Fishman would receive 10 percent of the money paid to Grecian for *The Yard* and that "the balance" would be divided between Levin and Grecian "as you mutually agree." *Ibid*. Neither party suggests that Levin responded to this email.

Levin or Fishman submitted an incomplete version of *The Yard* to an editor at Mulholland Books, an imprint of the publisher Little, Brown. Doc. 64 at ¶¶ 40, 43. Mulholland offered Grecian $10,000 for the book, and Levin and Fishman advised Grecian to reject the offer because they thought the book was worth much more. *Id*. at ¶¶ 43-45. Grecian completed the first draft of *The Yard* in May 2011, and Levin and Fishman sent the draft to thirteen publishers. *Id*. at ¶¶ 49-50. Fishman conducted an auction, and one of the offers, from Putnam Publishing, was a $500,000 guaranteed advance for the North American publishing rights to *The Yard* and one sequel. *Id*. at ¶¶ 53-55. Levin and Fishman recommended that Grecian accept this offer, and he ultimately did so. *Id*. at ¶ 56.

In July 2011, Grecian, Levin, and Fishman met in person to discuss the book deal for *The Yard* and possible deals for other books that Grecian had written or would write in the future. *Id*. at ¶¶ 61-63. The finalization of the deal for *The Yard* took several months, and in September 2011 Grecian emailed Levin to express his concern about the delays and to say that he wanted to be paid by the end of the year. *Id*. at ¶ 67.

Grecian was not always satisfied with his relationship with Levin. In November 2008, Grecian wrote Levin this email with the subject line "What happened to you?":

> You said we should expect to hear about the *Proof* pitch in September, but you haven't returned any of my emails since August. I also get your voice mail when I call and get no return call from you. I haven't received word on any pitch I've sent you.
>
> I'm frustrated. I know you've got clients with bigger careers than mine and I'm just not sure you have time for me. We're past the halfway point on my contract now and nothing seems to have happened with anything.

Doc. 68 at ¶ 80. Also in 2008, Grecian asked Levin to release him from the Agreement because Grecian believed that Levin had lost interest in him and had failed to promote his works adequately. *Id*. at ¶ 81. Levin refused to release Grecian and said "he would work harder." *Ibid*.

Grecian testified at deposition that, prior to mid-2011, which is when *The Yard* was finished and sold, "Levin had not done anything directly or concretely to assist me in my career, which was the reason for our relationship." *Id*. at ¶ 82.

That said, other evidence would permit a reasonable factfinder to conclude that Grecian thought that Levin was a good agent. In February 2010, Grecian wrote this email to a comic book artist:

> I don't know if I mentioned this to you, but the only thing I regret in my relationship with Ken (and I'd prefer you keep this between us) is signing a very long contract. My contract's almost up and I plan to stay with Ken, but I also don't need a contract with him after this. I'll work with him on a project-by-project basis.

Doc. 64 at ¶ 28. In December 2010, Grecian sent Levin and Fishman an email saying, "You've both been encouraging and helpful." *Id*. at ¶ 46. In March 2011, Grecian sent another email to Levin and Fishman saying, "I am grateful beyond words for your faith and interest in my career." *Id*. at ¶ 48. In May 2011, around the time that Grecian finished the first draft of *The Yard*, he wrote to Levin, "I think all three of us have good reason to feel pretty damn proud of ourselves right now." *Id*. at ¶ 51. A few days later, Grecian emailed Fishman, saying, "You and Ken [Levin] did good by me and I have a long memory," by which Grecian meant that Levin and Fishman "had both been instrumental in agenting for [Grecian], selling the novel." *Id*. at ¶ 57. In September 2011, Grecian recommended to a writer friend, Jai Nitz, that he hire Levin to represent him. *Id*. at ¶ 64. And the Acknowledgements page of *The Yard* says: "I owe many people a profound debt: My agents, Seth Fishman at The Gernert Company and Ken Levin at Night Sky, for talking me into writing this novel in the first place and then championing it beyond the call of duty …." *Id*. at ¶ 74. At deposition, Grecian explained: "I was by that point

referring to Mr. Fishman, but felt it would be impolite since they were a team, to leave Mr. Levin out. That's why I didn't remove him before the book was published." *Ibid*.

Around October 20, 2011, Levin and Grecian discussed the commissions that Levin and Fishman would be paid from the sale of *The Yard*. Doc. 68 at ¶ 90. Levin stated his view that he was entitled to a 15 percent commission and that Fishman would receive a further 10 percent, meaning that Grecian would pay a total commission of 25 percent. *Ibid*. Grecian responded: "You and Seth [Fishman] co-agent for me on my Putnam deal. I'm very grateful to you both, but an agent's fee is generally fifteen percent and I was under the impression that you and Seth would split that fee." *Id*. at ¶ 91. Grecian noted that Levin's proposal would require him to pay "a whopping twenty-five percent of my earnings … gone before I see a cent," and said "that's unacceptable." *Ibid*. Levin responded, "Let me give some thought to your email, as you did, and get back to you, probably tomorrow," but the record contains no evidence that Levin ever got back to Grecian. *Id*. at ¶ 92. Fishman told Grecian that "[t]he total commission that comes off your books is per usual, 15%. Anything more than that would be criminal!" *Id*. at ¶ 97.

On December 21, 2011, Grecian fired Levin. Doc. 64 at ¶ 70. (Although the Agreement's initial term had expired in November 2011, it had automatically renewed for an additional four-year term because Grecian had not sent a notice of termination at least six months prior to the initial term's end. Doc. 58-6 at 5-6.) On the same day, Grecian's attorney sent Levin a letter asserting that Levin had "failed to perform [his] obligations under [the] Agreement." Doc. 64 at ¶¶ 71-72. Grecian took the position that he owed Levin only a 5 percent commission from the sale of *The Yard* and offered him that much. Doc. 64 at ¶ 73; Doc. 68 at ¶ 93. Around a week later, Levin filed this suit. Doc. 68 at ¶ 93; Doc. 1-2. Fishman has since sold the rights

to the third and fourth novels in the series that started with *The Yard* for a further $500,000;

Levin did not participate in that deal. Doc. 68 at ¶¶ 115-116.

Grecian removed the suit to this court. Doc. 1. The removal was proper under 28 U.S.C.

§§ 1441 and 1446 because the case falls within the court's original jurisdiction under § 1332(a)

and because Grecian is not a citizen of Illinois, the state in which the action was filed, *see*

§ 1441(b)(2). Levin is a citizen of Illinois, Grecian is a citizen of Kansas, and the amount in

controversy exceeds § 1332(a)'s $75,000 threshold because the sales as to which Levin claims a

15 percent commission exceed $600,000, meaning that the amount in controversy is at least

$90,000. Doc. 1 at ¶¶ 4, 5, 7.

### Discussion

As indicated above, Levin seeks summary judgment on Count I of his complaint and on

Grecian's four counterclaims. The Agreement does not contain a choice-of-law provision.

Grecian suggests that the court apply Illinois law, Doc. 65 at 2 n.1, and Levin is silent as to

choice of law but consistently cites Illinois case law. Under these circumstances, the court will

apply Illinois law. *See Gould v. Artisoft, Inc.*, 1 F.3d 544, 549 n.7 (7th Cir. 1993) ("Where the

parties have not identified a conflict between the two bodies of state law that might apply to their

dispute, we will apply the law of the forum state—here, Illinois.").

### I.    Levin's Claim for a Declaratory Judgment That the Agreement Remains Enforceable and That Grecian Owes Levin a 15 Percent Commission

Count I of Levin's complaint seeks a declaratory judgment that the Agreement remains a

valid and enforceable contract and that it requires Grecian to pay Levin a 15 percent commission.

There is no dispute that the Agreement, at the time it was executed in 2004, was a valid and

enforceable contract that entitled Levin to a 15 percent commission. But Grecian offers four

independent grounds for holding that Levin cannot enforce the Agreement: (1) Levin materially

breached the Agreement by failing to represent Grecian effectively, thereby excusing Grecian from performing his own obligations under the Agreement; (2) Levin failed to work with Grecian to "formulate strategies" to develop his works, as required by § 2 of the Agreement; (3) Levin failed to keep Grecian "informed," as required by § 3 of the Agreement; and (4) Levin was required by § 4 of the Agreement to get pre-approval from Grecian in certain situations but failed to do so.  Doc. 64 at ¶ 75.  The first ground is sufficient to preclude summary judgment for Levin, and so the other grounds need not be considered.  In considering the first ground, the court will address Levin's response that even if Levin had materially breached the Agreement, Grecian waived the breach by continuing to accept Levin's services throughout the contract term.

A.      **Whether Levin Materially Breached the Agreement**

Grecian says that he does not have to pay Levin any commission under the Agreement because Levin himself had already materially breached the contract, rendering it unenforceable, by failing to effectively represent Grecian and his works.  Under Illinois law, a "party cannot sue for breach of contract without alleging and proving that he has himself substantially complied with all the material terms of the agreement," and so "a material breach of a contract will excuse the other party's performance."  *Costello v. Grundon*, 651 F.3d 614, 640 (7th Cir. 2011) (internal quotation marks omitted); *see also Elda Arnhold & Byzantio, LLC v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 700 (7th Cir. 2002) (same).  Thus, the question is whether a reasonable factfinder could conclude that Levin indeed breached the Agreement and, if so, that the breach was material.  To determine whether a breach is material, a court applying Illinois law must ask "whether the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it."  *Arrow Master, Inc. v. Unique Forming Ltd.*, 12 F.3d 709, 715 (7th Cir. 1993) (quoting *Haisma v. Edgar*, 578

11

N.E.2d 163, 168 (Ill. App. 1991)). "In other words, [the court] ask[s] whether the performance of that provision 'was a *sine qua non* of the contract's fulfillment.'" *Ibid.* (quoting *Sahadi v. Cont'l Ill. Nat'l Bank & Trust Co.*, 706 F.2d 193, 198 (7th Cir. 1983)).

The contractual duty at issue was Levin's duty to use his best efforts to promote and sell Grecian's work to publishers and others, such as movie producers. Levin acts as if Grecian's argument is that Levin had a contractual obligation to *succeed* in selling Grecian's books; Levin correctly points out that the Agreement imposes no such obligation. Doc. 57 at 11 ("This fails because Paragraph 1 of the Agreement does not oblige Levin to complete the sale of any works."); Doc. 67 at 2 ("Nothing in paragraph 1 says that Levin is obligated to actually 'sell' Grecian's Properties that Levin agreed to represent."). But Levin misunderstands Grecian's argument, which is not that Levin had a duty to make sales, but merely that Levin had a duty to use his best efforts to make sales. Grecian points to Levin's failure to make any sales not as a breach in itself, but merely as evidence that Levin did not exercise his best efforts: "Mr. Levin agreed in Paragraph 1 of the Agreement to be my agent, but he failed to effectively represent me, a fact best demonstrated by the fact he never sold a single one of my works during seven years, while Mr. Fishman sold The Yard for $500,000 in less than a year." Doc. 57 at 11 (quoting Doc. 64 at ¶ 75). The court will address Grecian's actual argument, not the argument that Levin wishes Grecian had made.

The Agreement does not refer to any "best efforts" duty explicitly, but § 1 makes Levin "the sole and exclusive representative of all of the rights to the Properties." Doc. 58-6 at 2. That provision brings this case within the scope of *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88 (N.Y. 1917) (Cardozo, J.), which read an implicit duty on the part of an exclusive representative "to use reasonable efforts to bring profits and revenues into existence," *id.* at 92. "Without an

implied promise, the transaction cannot have such business efficacy as both parties must have intended that at all events it should have." *Id*. at 91 (internal quotation marks omitted). "The doctrine announced in *Wood v. Lucy* is the law of Illinois." *Bonner v. Westbound Records, Inc.*, 394 N.E.2d 1303, 1309 (Ill. App. 1979). "A best-efforts clause, which contract law reads into exclusive dealerships, protects the seller from the dealer's exploiting the position that the exclusivity conferred (because it has eliminated competition from other dealers) by failing to promote the seller's product vigorously." *Classic Cheesecake Co. v. JPMorgan Chase Bank, N.A.*, 546 F.3d 839, 846 (7th Cir. 2008) (citing *Wood*).

Levin concedes that "an exclusive representative has an obligation to make reasonable efforts to effectuate the purposes of a contract," Doc. 67 at 4, and he does not appear to deny the indisputable fact that a principal purpose of the Agreement was for Levin to turn Grecian's creative output into money by selling it to publishers. Levin argues, rather, that he did work hard to promote Grecian's career and that his efforts ultimately paid off with the sale of *The Yard* for a substantial sum. It may be true that Levin satisfied the Agreement's implicit best efforts requirement. As described above, there is much evidence that Grecian was happy with Levin's performance as his agent, including in the final two years of the Agreement's term, 2010 and 2011. Levin also developed the idea that Grecian should write *The Yard* as a prose novel rather than as a graphic novel, and that format change may have been key to the generous deal that Grecian was able to get from Putnam. Moreover, it was Levin who brought in Fishman, and though the parties dispute exactly who did what, there is no doubt that Levin and Fishman between them were instrumental in getting Grecian the deal with Putnam.

On the other hand, there is evidence that casts doubt on whether Levin was exercising his best efforts throughout the Agreement's duration. There is Grecian's 2008 email to Levin

complaining that Grecian was "frustrated" because Levin had failed to get results by promoting *Proof* and had not been returning Grecian's calls or emails. Doc. 68 at ¶ 80. Grecian stated that "[w]e're past the halfway point on my contract now and nothing seems to have happened with anything," and he asked Levin to release him from the contract. *Ibid.* The fact that the parties exchanged 781 emails and that only 271 were sent by Levin, Doc. 64 at ¶ 11, implies that Grecian sent the other 510, a lopsided ratio consistent with the picture Grecian paints of Levin as a disengaged and often unresponsive agent. Levin admits that although he was very impressed with the quality of the work that Grecian sent him at the start of their relationship in 2004, Doc. 68 at ¶ 78—which a reasonable factfinder could take to mean that the work had commercial potential and should not have been too difficult to sell—he failed to sell any of Grecian's work for nearly seven years, *id*. at ¶ 83. When Levin finally sold *The Yard*, it was with Fishman's help, and the parties dispute their respective contributions to the sale—a reasonable factfinder could think the deal was mainly attributable to Fishman, who conducted the actual auction that led to Putnam's offer. So, although the Agreement did not obligate Levin to actually succeed in selling anything, a reasonable factfinder could find the admitted quality of Grecian's work and the speed with which *The Yard* was sold once Fishman was brought onboard, combined with Levin's failure to sell any of Grecian's work before then, to be persuasive evidence that Levin did not exercise his best efforts.

The general rule applicable in federal court holds that "whether a party has committed breach of contract is a question of fact." *Arrow Master, Inc.*, 12 F.3d at 714 (internal quotation marks omitted). For the reasons given above, whether Levin breached the Agreement's best efforts obligation cannot be resolved on summary judgment. The general rule also holds that "the question of whether or not a particular breach of a contract is material is a question of fact."

*Winforge, Inc. v. Coachmen Indus., Inc.*, 691 F.3d 856, 868 (7th Cir. 2012) (internal quotation marks omitted). The record likewise prohibits the materiality question from being resolved on summary judgment, at least in Levin's favor. And because a material breach by Levin would excuse Grecian's performance of his obligations under the Agreement, Levin is not entitled to summary judgment on Count I of his complaint.

### B.      Levin's Contention that Grecian Waived the Breach

Not so fast, Levin says; he submits that Grecian waived any argument that Levin had breached the Agreement by failing to assert that breach when it occurred and, instead, continuing to accept Levin's services under the contract, meaning that Grecian's performance is not excused even if Levin did materially breach. "Waiver is defined as the intentional relinquishment of a known right." *Ryder v. Bank of Hickory Hills*, 585 N.E.2d 46, 49 (Ill. 1991). The party claiming a waiver of a breach of contract must prove that the non-breaching party (1) knew of its right to assert the breaches, and (2) intended to waive the alleged breaches. *See Costello*, 651 F.3d at 641 (Illinois law). "Although waiver may be implied, the act relied on to constitute the waiver must be clear, unequivocal and decisive. The victim of a breach is not required to act immediately upon suspicion of a breach." *Galesburg Clinic Ass'n v. West*, 706 N.E.2d 1035, 1037 (Ill. App. 1999) (citation omitted). Moreover, "[t]he victim of a breach of contract is not required upon learning of the breach to wail and tear his hair." *Bank v. Truck Ins. Exchange*, 51 F.3d 736, 740 (7th Cir. 1995) (Illinois law). "[I]f the facts necessary to constitute waiver are in dispute or if reasonable minds might differ as to the inferences to be drawn from the undisputed evidence, then the issue becomes a question of fact." *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1140 (7th Cir. 2009).

Levin relies on *Delta Consulting*, which affirmed summary judgment on waiver grounds, but that decision is not controlling because the evidence of waiver in that case was indisputable. Randle was a construction company hired by a school district to build a high school. Disputes arose between Randle and the school district, the disputes caused delays, and the delays caused Randle to lose money. *Id*. at 1135. So Randle hired Delta, a consultancy, to prepare a "Request for Equitable Adjustment"— a request to be paid $1.6 million in additional fees to cover the losses—to submit to the school district. *Ibid*. After the school district rejected that request, Delta prepared and submitted a second request, which was also rejected, and Delta charged Randle some $144,000 for Delta's services—far more than Delta's $34,000 preliminary estimate. *Id*. at 1135-36. Randle paid Delta's invoices for several months, amounting to over $62,000, and submitted to the school district both of the requests that Delta had prepared, and when Randle ultimately sued the district, it asked Delta to hold off on collecting the balance of Delta's $144,000 invoice. *Id*. at 1136. A few months later, Randle conducted an internal audit and sent Delta a letter to confirm the amount it owed Delta; Delta responded with the correct amount. *Ibid*. Finally, "roughly a year later," Delta sought payment from Randle, and Randle for the first time "responded that it was not satisfied with Delta's performance and should not be charged for inadequate work." *Ibid*. Delta sued for payment under the contract, Randle countersued for breach of contract on the ground that Delta had failed to perform adequately and sought return of the $62,000 that Randle had already paid, and the district court granted summary judgment to Delta, holding that "Randle impliedly waived its right to damages for Delta's alleged breach by paying, and not contesting," the first $62,000 of the $144,000 invoice. *Id*. at 1137. The Seventh Circuit affirmed the district court's ruling, explaining:

> [Randle's] conduct [while actually receiving Delta's allegedly inadequate
> services] did not reasonably portray Randle's objection of payment for the

services rendered and does not reflect Randle's desire to seek its money back. In fact, these actions established the opposite; even though Delta's work was not what Randle expected, Randle continuously accepted Delta's performance by paying for it and never once objecting to it.

More importantly, Randle not only failed to contest what was paid, it acknowledged further indebtedness by asking Delta to suspend collection and by not objecting to the receipt of Delta's lowered statement of account. … Randle never objected to the invoices, never sought return of the money [it] paid and kept paying; this objective conduct manifested a clear, unequivocal and decisive intention to waive its rights.

*Id*. at 1141 (citation omitted).

The evidence of waiver in this case does not come close to approaching the evidence in *Delta Consulting*. The only evidence cited by Levin is that Grecian continued to employ Levin throughout the period when (Grecian now claims) Levin was in breach for failure to fulfill his best efforts obligation. Levin argues: "Grecian admits that he knew of Levin's alleged non-performance under the Agreement. He even says that, in 2008, he asked to be let out of the Agreement early. In response to Grecian's request, Levin allegedly promised to work harder. Thereafter, Grecian continued to allow Levin to work for him and accepted the benefits of Levin's work. In particular, as discussed above, Grecian allowed Levin to expend substantial effort on *The Yard* that Grecian admits was to his benefit." Doc. 67 at 10-11 (citations omitted).

Reasonable factfinders could draw varying inferences and conclusions from the record, including that although Grecian wanted Levin to be more active in promoting his books, he did not have a clear idea of what Levin's implicit "best efforts" obligation was under the Agreement and so did not know whether Levin had breached that obligation or whether he had a valid legal claim against Levin. In particular, the fact that Grecian asked to be released from the Agreement but did not sue for rescission when Levin refused suggests that Grecian was thinking in terms of an ideal and mutually beneficial business relationship between Levin and Grecian and not in

terms of their respective legal obligations. If Grecian did not know that Levin's inaction was potentially a material breach, then he could not have knowingly waived his right to assert that breach. *See Costello*, 651 F.3d at 641 (the party claiming waiver has the burden to prove that the other party knew of its right to assert that the party claiming waiver had breached the contract); *Ryder*, 585 N.E.2d at 49 (defining waiver as "the intentional relinquishment of a *known* right") (emphasis added). Levin therefore has not presented the sort of unequivocal evidence of a knowing and intentional waiver that the case law requires, and so the court cannot say for summary judgment purposes that Grecian waived his contractual right to have Levin exercise his best efforts to promote and sell Grecian's literary output. *See Wald v. Chi. Shippers Ass'n*, 529 N.E.2d 1138, 1147-48 (Ill. App. 1988) ("if the facts necessary to constitute waiver are in dispute or if reasonable minds might differ as to inferences to be drawn from undisputed evidence, then the issue becomes a question of fact"); *Smith v. Sturgeon*, 342 N.E.2d 420, 421 (Ill. App. 1976) ("Whether the [plaintiff's] continued acceptance of … past due payments without a demand for more prompt payment constitutes waiver of a provision[] in the contract is a question of fact.").

## II.     Grecian's Counterclaim for Breach of Contract

Grecian's first counterclaim alleges that Levin breached his obligations under the Agreement and seeks damages for that breach. Doc. 8 at p. 15. As discussed in the previous section, the court cannot say at the summary judgment stage that Levin did not breach the Agreement, and so it will assume for purposes of this counterclaim that Levin breached. Nonetheless, Levin is entitled to summary judgment on the contract counterclaim because Grecian has failed to submit sufficient evidence of damages.

"Under Illinois law, a plaintiff looking to state a colorable breach of contract claim must allege four elements: '(1) the existence of a valid and enforceable contract; (2) substantial

performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages.'" *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. 2004)).  "Therefore, under Illinois law, it is necessary to show damages—not the specific amount, but rather that the plaintiff did, in fact, suffer some damages.  Merely showing that a contract has been breached without demonstrating actual damage does not suffice, under Illinois law, to state a claim for breach of contract." *TAS Distributing Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007) (citation omitted).  "In Illinois, in order to recover for breach of contract, a plaintiff must establish both 'that he sustained damages and he must also establish a reasonable basis for computation of those damages.'  The party claiming damage bears the burden of proving those damages to a reasonable degree of certainty."  *Id.* at 632 (quoting *Ellens v. Chi. Area Office Fed. Credit Union*, 576 N.E.2d 263, 267 (Ill. App. 1991)) (brackets and ellipsis omitted).

Of particular significance here, the Seventh Circuit has held that, "to survive a motion for summary judgment on a breach of contract claim, the plaintiff must provide a basis upon which lost profits may be calculated to a reasonable certainty."  *Id.* at 636.  Thus, Grecian must present not only evidence from which a reasonable factfinder could conclude that he indeed sustained damages, but also a basis upon which his damages "may be calculated to a reasonable certainty." Levin is entitled to summary judgment because Grecian has failed to present a reasonable basis for computing his damages despite having been put on notice that Levin viewed the absence of damages as a ground for summary judgment.  Doc. 57 at 15 ("Levin should be granted summary judgment for the reasons discussed at length above, including lack of damages.").

Grecian asserts that "the subsequent actual sales of Grecian's books [*The Yard* and its sequel, *The Black Country*, as well as two further sequels sold for a further $500,000] by

Fishman establish a 'reasonable basis for computing [the] damages' which resulted from Levin's failure, over a seven-year period, to sell a single one of Grecian's books." Doc. 65 at 10. But Grecian does not explain how this is so. Does Grecian believe he was damaged because Levin did not sell *The Yard* as quickly as he should have, or because Levin failed to sell other books of Grecian's that have thus far not been published? Grecian does not say, but the court will consider both alternatives.

If Grecian could establish that Levin should have sold *The Yard* more swiftly for the same $500,000 he received from Putnam, then Grecian's loss would be the time value of Grecian's cut of that money over the period between when Levin first should have sold the work (had he been exercising his best efforts) and the time when it was in fact sold to Putnam. But Grecian does not suggest that Levin should have sold *The Yard* more swiftly, and there is no evidence that he could have done so had he tried harder. The first draft of *The Yard* was finished in May 2011, at which time it was quickly sent out to potential publishers. Doc. 64 at ¶¶ 49-50. The auction was conducted, and Grecian received Putnam's $500,000 offer that same month. *Id.* at ¶ 53 ("On May 12, 2011, Fishman conducted the auction."). And recall that Little, Brown's Mulholland imprint offered Grecian only $10,000 for the book after seeing a partial draft, and Levin and Fishman advised Grecian to reject that offer—sensibly, as it turns out. *Id.* at ¶¶ 43-45. There is no evidence that Levin, by working harder, could have obtained a $500,000 deal any sooner than he and Fishman did.

The other potential damage theory turns on the losses sustained from Levin's failure to sell any of Grecian's other works. Under that theory, Grecian's damages are the amounts for which Levin would have sold the books had he met his best efforts obligation under the Agreement. Doc. 68 at ¶ 83 (noting that Levin did not sell any of Grecian's works other than

*The Yard*).  But Grecian fails to provide the requisite "reasonable basis for computation of those damages" under that theory.  To do so, he would have to point to one or more works that he had written prior to or during the contract period, provide some ground from which a reasonable factfinder could conclude that the works would have been sold had Levin worked harder at promoting them—for instance, evidence that persons with the relevant expertise viewed them as being of publishable quality or of quality similar to specific works by other authors that were published, or actual publication offers received after the contract period for Grecian's other works—and provide some ground for computing the amount he might have been paid had those books found a publisher, perhaps by reference to the amounts paid by publishers during that period for books of the same genre by authors of similar renown, along with evidence on other factors that influence pricing.

Grecian has not attempted to do any of this.  Although there is evidence that he had written several other novels, Grecian does not identify any one novel in particular and say that it was of saleable quality or that Levin should have sold it.  And Grecian certainly provides no evidence that any such novel would have had success comparable to *The Yard*'s.  Levin's Local Rule 56.1(a)(3) statement mentions a "work" called "The Impossible Snowman" that existed when the Agreement was executed.  Doc. 58 at ¶ 5.  But there is no evidence as to what sort of "work" it was—the Agreement treated novels, comic books, and other works differently, Doc. 58-6 at 3-4, and the value of *The Yard* as a comparator is that much weaker if "The Impossible Snowman" was not also a novel.  The Agreement itself references five other "literary and/or comic art properties" along with "The Impossible Snowman," but it provides no details on them except that one was "a novel in development."  Doc. 58-6 at 8.  The parties' Local Rule 56.1 statements provide no indication that this work, or any of the others listed, was ever finished.

Paragraph 23 of Levin's Local Rule 56.1(a)(3) statement asserts that Levin "forwarded … Grecian's most recent draft of two unpublished prose novels to Fishman." Doc. 58 at ¶ 23. This reference is not evidence that Levin should have sold the novels. Grecian's Local Rule 56.1(b)(3)(B) response says about those novels, *Joyride* and *Paradise Flats*, that Fishman thought the drafts "were clearly saleable" and made positive comments about them. Doc. 64 at ¶ 23. Grecian's response that the drafts "were clearly saleable" is entirely extraneous to the Levin's straightforward assertion in ¶ 23 that he "forwarded *Proof* and Grecian's most recent draft of two unpublished prose novels to Fishman," a fact that Grecian admits is "[u]ncontroverted." The court therefore will disregard the portion of Grecian's response that references what Fishman thought of the novels. *See Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008) (affirming the district court's refusal to consider additional facts set forth in the non-movant's Local Rule 56.1(b)(3)(B) response); *Eason v. Nolan*, 416 F. App'x 569, 569-70 (7th Cir. 2011) (same); *Johnson*, 2012 WL 2905485, at *12 (same).

Paragraph 36 of Levin's Local Rule 56.1(a)(3) statement and ¶ 37 of Grecian's Local Rule 56.1(b)(3)(B) response refer to the fact that Grecian "had previously written two prose novels, but they had never been published," Doc. 64 at ¶¶ 36-37, but there is no evidence that the novels were saleable, much less that they were comparable to *The Yard*. Paragraph 39 of Levin's statement states that "Levin and Fishman also repeatedly provided feedback to Grecian on drafts of portions of other works, including one called Paradise Flats," Doc. 58 at ¶ 39, which again is not evidence that *Paradise Flats* could have sold. Paragraphs 62 and 63 refer to a disagreement between Levin and Fishman as to "two other books that Grecian had previously authored," *Collision* and *Paradise Flats*; apparently "Levin recommended going with a different publisher [than Putnam] for those books, but Fishman wanted to take them to Putnam Publishing." *Id*. at

¶¶ 62-63.  This implies that Levin and Fishman thought they might be able to sell those works as of July 2011, *id.* at ¶ 61, after Putnam had made the offer for *The Yard*, or at least that they thought that they should try to do so, but it does not suggest that Levin could have sold them prior to then if he had been exercising his best efforts.  And even if Grecian had pointed to other completed novels, the court could not assume, in the absence of evidence, that they could have been sold for an amount anywhere near the $500,000 figure garnered by *The Yard*.  The mere fact that *The Yard* sold so quickly and for so much, while none of Grecian's earlier works had sold, would not compel a reasonable factfinder to conclude that the earlier works were of similar commercial value.

For these reasons, Grecian has not "provide[d] a basis upon which lost profits may be calculated to a reasonable certainty," as precedent required him to do to avert summary judgment.  *TAS Distributing Co.*, 491 F.3d at 636.  Although the discussion of Grecian's contract counterclaim could end here, it bears mention that the court's disposition of that counterclaim finds additional support in the "new business rule."

"Under Illinois law, a new business generally has no right to recover lost profits.  This element of damages is recoverable only if the business was previously established."  *Stuart Park Assocs. L.P. v. Ameritech Pension Trust*, 51 F.3d 1319, 1328 (7th Cir. 1995).  Here, Grecian was not "previously established" as a novelist at the time that Levin failed to sell his works.  Thus, Grecian "was not in the position of the bestselling author who can prove from his past success that his new book, which the defendant fails to promote, would have been likely—not certain, of course—to have enjoyed a success comparable to that of the average of his previous books if only it had been promoted as promised.  That would be like a case of a new business launched by

an entrepreneur with a proven track record." *MindGames, Inc. v. Western Publ'g Co.*, 218 F.3d 652, 658 (7th Cir. 2000).

Although Grecian could be said to have become established subsequently, with the sale of *The Yard*, there is (again) no evidence that *The Yard* was so similar to his previous works as to make them the same "business." In *Stuart Park Associates*, a Seventh Circuit decision applying the new business rule, a partnership created to develop a plot of land sued potential investors who had refused to advance the partnership the funds they had promised. 51 F.3d at 1320-21. The district court held that the partnership could not recover lost profits "in light of its status as a new and unproven venture," and the Seventh Circuit affirmed. *Id*. at 1328. The court dealt as follows with the partnership's argument that its other development ventures provided a basis for estimating lost profits sufficient to overcome the new business rule:

> The apartment complex was to be built on a barren piece of undeveloped land. No evidence demonstrated what, if anything, this particular venture would yield. Summit [the partnership] argues vehemently that its successes with other apartment buildings should be considered as probative of this essential fact. However, these are different pieces of real estate from different markets—not providing a self-evident basis for generalization.

*Ibid*. The same result is warranted here given the absence of any evidence that Grecian's unpublished works were similar enough to *The Yard* that *The Yard* could provide a basis for predicting how the other works would have fared commercially had Levin exercised his best efforts to sell them.

Grecian points to three cases where courts have found evidence of subsequent business activity to be adequate proof of lost profits. Doc. 65 at 9-10. Those cases—with a combined length of over 90 pages, which Grecian cites in their entirety rather than providing pin cites—are not on point, for the plaintiff in all three would have received the profits from a business over the course of a certain period had he not been wrongfully deprived of the business during that

period.  *See Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir. 1986); *Malatesta v. Leichter*, 542 N.E.2d 768 (Ill. App. 1989); *Rhodes v. Sigler*, 357 N.E.2d 846 (Ill. App. 1976).  The decisions reasonably allowed the profits actually earned by the business over the same (or a similar) time period to prove, to a reasonable degree of certainty, the amount that the plaintiff would have received but for the breach of contract or other wrongful act.  In this case, for example, had somebody stolen the draft of *The Yard* and falsely presented it to publishers as his own work, leading the thief to receive the $500,000 Putnam deal, then of course Grecian, after proving that he had the legal rights to the novel, would be entitled to argue that he would have received just as good a deal for the book as the thief had; although this would not necessarily be true, since perhaps the thief was a better negotiator or had better contacts in the industry, it would likely meet the "reasonable certainty" standard.  *See MindGames, Inc.*, 218 F.3d at 658 ("some degree of speculation is permissible in computing damages, because reasonable doubts as to remedy ought to be resolved against the wrongdoer") (internal quotation marks omitted).  But the three decisions cited by Grecian do not support the assumption that his *other* books were of the same value as *The Yard* absent any evidence that they are comparable to that novel in any way beyond having been written by the same man.

    As indicated above, "to survive a motion for summary judgment on a breach of contract claim, the plaintiff must provide a basis upon which lost profits may be calculated to a reasonable certainty."  *TAS Distributing Co.*, 491 F.3d at 636.  Because Grecian has failed to do this, Levin is entitled to summary judgment on Grecian's breach of contract counterclaim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.").

### III.    Grecian's Counterclaim for Breach of Fiduciary Duty

In his second counterclaim, Grecian alleges that Levin breached the fiduciary duty he owed Grecian as his agent by engaging in self-dealing to Grecian's detriment.  Doc. 8 at pp. 15-16.  "Self-dealing, conflicts of interest, or even divided loyalties are inconsistent with fiduciary responsibilities."  *Howell v. Motorola, Inc.*, 633 F.3d 552, 566 (7th Cir. 2011).  Grecian points to three alleged acts of self-dealing: (1) Levin "repeatedly encouraged Grecian to agree to make Levin his co-writer on projects"; (2) "Levin appeared interested only in making pitches to publishers that Levin appeared to have some ownership or other interest in"; and (3) "Levin was also interested in promoting his own film and movie business, and even cut himself in on a purported TV option Levin claimed to have sold for PROOF."  Doc. 8 at p. 16.  Levin does not dispute that he owed Grecian a fiduciary duty, but he contends that the undisputed facts show that he did not breach that duty.

With respect to the first alleged breach, Grecian concedes that he was not harmed in any way by Levin's alleged requests that they co-write something, Doc. 64 at ¶ 76, and his summary judgment brief does not even mention this allegation.  Accordingly, Grecian has forfeited any claim based on this alleged breach.  *See Witte v. Wis. Dep't of Corr.*, 434 F.3d 1031, 1038 (7th Cir. 2006) (holding that the non-movant forfeits arguments not raised in his brief opposing summary judgment).

With respect to the second alleged breach, Grecian's testimony that "Levin appeared interested only in making pitches to publishers that Levin appeared to have some ownership or other interest in" is not sufficient evidence of self-dealing to get past summary judgment.  Indeed, it is no evidence at all, for Grecian's statement is so vague as to be without meaning—it hedges twice with the qualification "appeared"—and it does not specify any publishers in which

Levin had "some ownership or other interest" or describe what interest he had.  The record does not indicate that Levin had any financial interest in any publisher, and Grecian does not say what sort of "other interest" Levin had in any of the publishers he dealt with.

With respect to the third alleged breach, Grecian's argument that Levin improperly sought to get himself a "passive producer" title with yearly pay of $45,000 to $75,000 when he tried to get a television or movie deal for *Proof* is undermined by the Agreement itself.  Section 6.C of the Agreement provides:

> C.  Ken Acting in a Producing Capacity:  Ken [Levin] has and intends in the future to act in various active or passive producing capacities in respect of movie and television development of projects he is attached to.  *Alex [Grecian] acknowledges that Ken has the right and it is expected he may act in a producing capacity in respect of one or more of the Properties covered by this Agreement*, provided, however, that in the event Ken effects a Set-Up of any of the Properties which is approved by Alex and where Ken would be receiving monies for producing services, then (a) Ken shall so advise Alex as part of the deal information, and (b) in the event Ken is contracted to receive monies in respect to a Property as a "passive" producer (that is, is receiving a credit and monies without providing material services during the Property's development), then to the extent Ken receives any such "passive" producer fees in excess of any passive producer or Services fees received by Alex during the Property's development, such amounts shall be credited to Alex against any monies which Ken might otherwise be entitled to hereunder in respect of that Property.

Doc. 58-6 at 4-5 (emphasis added).

By its plain terms, § 6.C permitted Levin to act and take money as a passive producer so long as he met certain requirements, and Grecian does not suggest that those requirements were not met.  Because Levin was acting pursuant to an express authorization in the Agreement, he could not have breached fiduciary duties that existed as a result of the relationship created by that Agreement.  *See LID Assocs. v. Dolan*, 756 N.E.2d 866, 880 (Ill. App. 2001) ("Under Illinois law, a general partner will not be deemed in breach of his fiduciary duties where he has complied with an express authorization in the partnership agreement.").  Section 6.C amounted to a

consent by Grecian to Levin's acting as a producer and receiving money in that capacity, and an agent cannot be liable for a breach of fiduciary duty where he has acted in keeping with his principal's express consent. *See McNamara v. Johnston*, 522 F.2d 1157, 1165-66 (7th Cir. 1975) ("fundamental fairness requires, that as between agent and principal, an agent cannot be held liable for the use of the principal's property in an unlawful manner when it is reasonable to infer that the principal authorized the agent's conduct"); *Kohler v. Leslie Hindman, Inc.*, 1995 WL 89015, at *6 (N.D. Ill. Feb. 24, 1995) ("there can be no breach of fiduciary duty where, as here, the agent's acts are authorized by the principal").

Because none of Grecian's fiduciary duty arguments has merit, Levin is entitled to summary judgment on the fiduciary duty counterclaim.

## IV.    Grecian's Counterclaim for Declaratory Judgment That the Agreement Is Terminated

Grecian's third counterclaim seeks a declaratory judgment that Levin, by materially breaching the Agreement, relieved Grecian of any obligation to perform under the Agreement by paying Levin's commission. Doc. 8 at pp. 16-17. This counterclaim is the mirror image of Levin's claim for a declaratory judgment that Grecian remains bound by the Agreement. As shown above, the record would allow a reasonable factfinder to find for either party on this issue. As such, summary judgment is inappropriate on this counterclaim.

## V.    Grecian's Counterclaim for Declaratory Judgment That Levin Is Owed, at Most, a Five Percent Commission

Grecian's fourth counterclaim seeks a declaration that, assuming the Agreement remains binding, Levin is entitled to only a 5 percent commission on the publication of *The Yard* rather than the 15 percent promised by the Agreement because Levin agreed with Fishman and Grecian that Levin would take only 5 percent of any publishing proceeds for that work and its sequel,

leaving the other 10 percent to Fishman. Doc. 8 at p. 17. In his summary judgment brief, Grecian makes two distinct arguments for limiting Levin to a 5 percent commission. The first is that Levin and Fishman contracted between them for Levin to receive 5 percent and Fishman 10 percent, and that Grecian is a third-party beneficiary of this contract and may therefore enforce its terms against Levin. The second is that, regardless of the contractual arrangements among the parties, Levin should be estopped from claiming more than 5 percent because he knowingly allowed Grecian to believe that he would be paying only a 15 percent combined commission to Levin and Fishman, Grecian relied on this understanding in allowing both Levin and Fishman to sell *The Yard* for him, and Levin intentionally waited until after *The Yard* had sold—when it was too late for Grecian to seek a different arrangement—to claim a 15 percent commission for himself on top of the 10 percent commission to Fishman.

Whatever the merits of the first argument, the second is sufficient to preclude summary judgment. "The general rule is that where a person by his or her statements and conduct leads a party to do something that the party would not have done but for such statements and conduct, that person will not be allowed to deny his or her words or acts to the damage of the other party. Equitable estoppel may be defined as the effect of the person's conduct whereby the person is barred from asserting rights that might otherwise have existed against the other party who, in good faith, relied upon such conduct and has been thereby led to change his or her position for the worse." *Geddes v. Mill Creek Country Club, Inc.*, 751 N.E.2d 1150, 1157 (Ill. 2011) (citations omitted). "Under Illinois law, the test used to evaluate an estoppel claim is whether, considering all the circumstances of the specific case, conscience and honest dealing require that a party be estopped." *In re Krueger*, 192 F.3d 733, 740 (7th Cir. 1999) (brackets and internal quotation marks omitted). The party asserting estoppel must show the following elements:

(1) voluntary words or conduct by the estopped party amounting to a misrepresentation or concealment of material facts; (2) actual or implied knowledge of the estopped party that the representations were not true; (3) lack of knowledge of the true facts by the innocent party both at time made or at time acted upon; (4) intent, or a reasonable expectation, on the part of the estopped party that the innocent party would act on the misrepresentations; (5) a reasonable, good-faith, detrimental change of position by the innocent party based on the misrepresentations; and (6) prejudice to the innocent party.

*Id.* at 740-41 (quoting *Hubble v. O'Connor*, 684 N.E.2d 816, 825 (Ill. App. 1997)). As the

Supreme Court of Illinois has elaborated:

> Regarding the first two elements, the representation need not be fraudulent in the strict legal sense or done with an intent to mislead or deceive. Although fraud is an essential element, it is sufficient that a fraudulent or unjust effect results from allowing another person to raise a claim inconsistent with his or her former declarations. …
>
> Estoppel may arise from silence as well as words. It may arise where there is a duty to speak and the party on whom the duty rests has an opportunity to speak, and, knowing the circumstances, keeps silent. It is the duty of a person having a right, and seeing another about to commit an act infringing upon it, to assert his right. He cannot by his silence induce or encourage the commission of the act and then be heard to complain.
>
> The question of estoppel must depend on the facts of each case. The party claiming estoppel has the burden of proving it by clear and unequivocal evidence.

*Geddes*, 751 N.E.2d at 1157-58 (citations and internal quotation marks omitted).

A reasonable factfinder could conclude that all elements of estoppel are present here: (1) that Levin stayed silent when he should have told Grecian that he planned to demand 15 percent for himself on top of the 10 percent to Fishman, an obligation heightened by Levin's fiduciary duty to Grecian as his agent; (2) that Levin knew that he planned to demand 15 percent for himself; (3) that Grecian thought he would be paying only 5 percent to Levin and the other 10 percent to Fishman because Levin had brought Fishman on as his "co-agent," Doc. 68 at ¶ 85; (4) that Grecian reasonably relied on Levin's failure to set him straight in failing to broach the

issue before *The Yard* was sold, when Grecian might have either objected to Fishman's presence or negotiated to pay less to Levin; (5) that this reliance was detrimental to Grecian, since he ended up owing 25 percent (according to Levin) rather than the combined 15 percent commission he might otherwise have negotiated for; and (6) that owing at least $50,000 (10 percent of $500,000) more than he otherwise would have owed constituted "prejudice" to Grecian. Under those circumstances, Levin would be estopped from demanding more than 5 percent, since by his silence he knowingly took advantage of Grecian's reliance on (what according to Levin was) a misconception about what he would owe if Levin and Fishman succeeded in selling the book.

That Grecian expected to pay only 15 percent total, and that this expectation was reasonable, is made clear for summary judgment purposes by the email that Grecian sent to Levin in response to Levin's demand for a 15 percent cut for himself: "You and Seth [Fishman] co-agent for me on my Putnam deal. I'm very grateful to you both, but an agent's fee is generally fifteen percent and I was under the impression that you and Seth would split that fee." *Id*. at ¶ 91. If Grecian thought that he would owe only 15 percent total, a factfinder could reasonably conclude that he relied on this supposition when he allowed Levin and Fishman to work together, rather than, say, making it an explicit condition of Fishman's assisting Levin that the two would split the 15 percent commission that would otherwise go to Levin alone. Such reliance would obviously have been detrimental since, assuming Levin's views of the Agreement are correct, Grecian obligated himself to pay 10 percent more than he would have otherwise been obligated to pay. Moreover, a reasonable factfinder could believe that Levin was aware of Grecian's misconception and intentionally refrained from correcting it until *The Yard* had sold, by which point it was too late for Grecian to seek a better deal with Levin and Fishman. Because

Levin would be estopped from seeking more than a 5 percent commission under those facts, and because a reasonable factfinder could find that those were indeed the true facts, Levin is not entitled to summary judgment on this counterclaim.

## Conclusion

For the reasons stated above, Levin's summary judgment motion is granted in part and denied in part. Summary judgment is granted as to Grecian's counterclaims for breach of contract and breach of fiduciary duty. But Levin's declaratory judgment claim, Grecian's mirror-image declaratory judgment claim, and Grecian's claim that Levin is estopped from demanding more than a 5 percent commission shall proceed to trial along with Levin's claim for anticipatory breach of contract.

May 31, 2013

_____
United States District Judge