UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KEN F. LEVIN, | ) | |
| | ) | |
| Plaintiff, | ) | 12 C 767 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| ALEXANDER GRECIAN, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Ken Levin, a literary agent, brought this suit against his former client, author Alex Grecian, Doc. 1-2, and Grecian filed counterclaims, Doc. 8 at 11-17. Levin moved for summary judgment on one of his two claims and on Grecian's four counterclaims, and the court granted the motion only with respect to two of the counterclaims. 2013 WL 2403642 (N.D. Ill. May 31, 2013). A bench trial is set for October 7, 2013. Doc. 49. Levin's two claims will be tried, as will Grecian's two surviving counterclaims.

Levin's first claim seeks a declaration that Levin's and Grecian's representation agreement ("Agreement") is a valid and enforceable contract that entitles Levin to fifteen percent of the money that Grecian receives for the rights to publish his novel *The Yard*, a New York Times bestseller, and its sequel, *The Black Country*, which was released earlier this year. The second claim rests on the same factual predicate and seeks damages for anticipatory breach of contract. Grecian's first surviving counterclaim, which is the mirror image of Levin's first claim, seeks a declaration that Levin failed to exercise his best efforts to sell Grecian's works and thereby materially breached the Agreement, meaning that Grecian owes Levin nothing. The other counterclaim seeks in the alternative a declaration that Levin is entitled to only a five

1

percent commission as the "co-agent" of Seth Fishman, who worked with Levin to sell Grecian's works and who, according to Grecian, is entitled to the remaining ten percent of the fifteen percent commission allowed by the Agreement. The claims and counterclaims are described in detail in the summary judgment opinion, familiarity with which is assumed.

Now before the court is Levin's motion under Federal Rule of Evidence 702 to exclude the testimony and opinions of Donald Maass, whom Grecian offers as an expert witness. Doc. 53. The motion is granted in part and denied in part. Maass may offer opinions on the custom and practice of literary "co-agent" arrangements and on whether Levin and Fishman were co-agents, along with general background about the publishing industry necessary to provide context for those opinions, but he may not offer opinions on any other topic.

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010). The district court serves as the "gate-keeper who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007) (citation and internal quotation marks omitted). The expert's proponent bears the burden of proving by a preponderance of the evidence that the expert's testimony satisfies Rule 702. *See Lewis v. CITGO Petrol. Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

Maass has provided a report under Federal Rule of Civil Procedure 26(a)(2), Doc. 55-2, and has been deposed, Doc. 55-3. In his response to Levin's motion, Grecian defends Maass's opinions on only two topics: (1) the custom and practice of literary "co-agent" arrangements and whether Levin and Fishman were co-agents; and (2) the standard of care in the publishing industry as it relates "to Levin's claim that he fulfilled his duties under the Agreement, and to Grecian's counterclaims that Levin failed to fulfill his duties." Doc. 63 at 10-11. As Levin notes in his reply, Grecian failed to address Levin's arguments for excluding Maass's other opinions— including whether Levin's claims and Grecian's counterclaims are valid, whether Grecian was a "naïve author" and Levin a "negligent literary agent," whether Levin and Grecian actually "understood" that Levin and Fishman would split the fifteen percent commission called for by the Agreement, and how the Agreement should be interpreted. Doc. 66 at 2. That failure operates as a forfeiture. *See Arlin–Golf, LLC v. Vill. of Arlington Heights,* 631 F.3d 818, 822 (7th Cir. 2011) (where a party "cited no legal authority to the district to support the proposition … the argument is waived"); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument … results in waiver."); *Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001) (a party's failure to respond to the other party's non-frivolous argument "operates as a waiver"). In light of Grecian's forfeiture, Levin's motion is granted as to those other opinions, and the court will confine its analysis to the two opinions that Grecian defends.

Maass began his career in the publishing industry in 1977. Doc. 55-2 at 3. In 1980, he founded the Donald Maass Literary Agency, which he continues to own and operate. *Id*. at 4. The agency employs six other literary agents, represents more than 150 writers (mostly novelists), and licenses over 150 literary works to major publishers each year. *Ibid*. Maas has

worked with both "sub-agents" and "co-agents"—two industry terms that he explicates at length—and has written numerous books focused on "the development of fiction careers" and "advanced fiction technique." *Ibid*. Maass served from 2000 through 2002 as the president of the Association of Authors Representatives, Inc. ("AAR"), which he describes as "the only trade association (or oversight body of any kind) for literary agents." *Ibid*. His Twitter feed boasts over 8000 followers. *Ibid*.

Maass provides the following opinions regarding co-agent custom and practice in the American publishing industry and whether Levin and Grecian were co-agents:

> Agents rely on experience. … There is no textbook on literary agency. There is no industry database tracking agents' commission rates. There are no laws setting commissions due to co-agents. …
>
> Where there is hard data to assist, I reference it here; otherwise, I speak from experience.
>
> AAR does not, and cannot, regulate how much or in what manner member agents charge for their services. … Even so, virtually all member agents [of the AAR] charge a commission, almost universally 15% of authors' revenues.
>
> …
>
> Most of the time an author is represented in book deals by their primary literary agent. Sub-agents come into play in sales of subsidiary rights, such as the right to translate and publish a work in another language. Sub-agents can work in domestic markets, too, as when a Hollywood agent accomplishes a "book-to-film" deal on behalf of an agent in New York. In such cases the total domestic 15% commission is split, usually equally, between primary agent and sub-agent.
>
> What is a "co-agent" versus a "sub-agent"? A sub-agent performs all the functions o[f] a primary agent, but in the separate market of Paris or Hollywood, acting in a subsidiary but independent capacity and reporting back to the primary agent. Co-agents by contrast work together, sharing the functions involved in accomplishing a deal. It's as if they're partners sharing the same office, attending the same meetings and making mutual decisions. <u>It is customary and standard practice in the book publishing industry for co-agents to split (most often equally) the 15% commission charged a client.</u>

4

> *<u>This makes sense, as the client is getting the same single set of service, just from two people working together.</u>*
>
> …
>
> The depositions of Levin, Grecian and Fishman … confirm that Levin and Fishman did complimentary and concurrent work leading to the eventual book deal. Levin brought the author and property called "The Yard", participated in pitching it as a graphic novel, stayed involved as it was instead written as a novel, and offered advice leading to declining the first small offer in hopes of a larger offer later. Fishman brought knowledge of publishing, submissions to publishers, management of a complex auction, advice, contract vetting … and later U.K. and translation deals.
>
> Fishman was not a sub-agent. Levin and Fishman were co-agents. The distinction matters. A sub-agent does distinct work in a distinct market for a distinct commission. Co-agents do the same work, in the same market for the same single commission.

*Id*. at 3, 6-8, 9-10.

Levin argues that Maass's opinions do not satisfy Rule 702 because his method "(1) lacks a testable hypothesis; (2) has not been subjected to peer review; (3) has no known rate of error; (4) has no standards; and (5) is not 'generally accepted.'" Doc. 55 at 7. These criteria certainly apply to expert testimony in scientific or other technical fields, such as engineering. But it is difficult to see how any testimony on the custom and practice of the publishing industry could ever meet them. As Maass states without contradiction from Levin, "[t]here is no textbook on literary agency," "[t]here is no industry database tracking agents' commission rates," "[t]here are no laws setting commissions due to co-agents," and "[i]n discussing the customs and practices of literary agents, …, one is largely reliant on experience, knowledge, shared history and informal networking." Doc. 55-2 at 3.

It therefore is unsurprising that *Chapman v. Maytag Corp.*, 297 F.3d 682 (7th Cir. 2002), the Seventh Circuit decision from which Levin draws the above-quoted factors, acknowledges that those factors are "nonexclusive" rather than strict requirements. *Id*. at 687. Along these

lines, the Seventh Circuit has made clear that "the test for reliability for nonscientific experts is flexible and [that] … *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *United States v. Romero*, 189 F.3d 576, 584 (7th Cir. 1999) (internal quotation marks omitted). It follows that Maass's proposed testimony "is not unreliable simply because it is founded on his experience rather than on data; indeed, Rule 702 allows a witness to be qualified as an expert 'by knowledge, skill, *experience*, training, or education.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (quoting Fed. R. Evid. 702) (emphasis added by the Seventh Circuit); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (distinguishing expert testimony based on science and engineering from "other cases," in which "the relevant reliability concerns may focus upon personal knowledge or experience," and reaffirming that the *Daubert* factors "do *not* constitute a 'definitive checklist or test'") (quoting *Daubert*, 509 U.S. at 593). "[W]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) (brackets and internal quotation marks omitted). So, contrary to Levin's suggestion, the fact that Maass's opinions do not meet the factors used in evaluating scientific or technical expert testimony does not require their exclusion. *See Donovan v. Quade*, 830 F. Supp. 2d 460, 473 (N.D. Ill. 2011) (holding that a proposed expert's "extensive practical experience in the entertainment industry" allowed him to offer opinions regarding rights payments in the theater industry).

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010)

6

(quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)). Maass's lengthy and extensive experience in the publishing world and his familiarity with co-agent arrangements easily meet this standard. Levin contends that Maass is unqualified to testify about co-agent arrangements because Maass has personally acted as a co-agent "only in situations where one book had two authors and each author had his or her own agent," while in this case "one author [Grecian] had multiple agents with respect to the same book." Doc. 66 at 9. Levin does not explain why this distinction should make a difference—for example, Levin points to no evidence that the two sorts of co-agent arrangement are treated differently in the publishing industry—and even if the distinction were somehow meaningful, Maass's extensive industry experience qualifies him to opine on co-agent arrangements that he has encountered even if he has not personally engaged in them. *See Exum v. Gen. Elec. Co.,* 819 F.2d 1158, 1163-64 (D.C. Cir. 1987) (allowing an engineer experienced in industrial safety and product design, but lacking specific expertise in kitchen design, to provide expert testimony regarding the design of an industrial fryer); *Lorillard Tobacco Co. v. Elston Self Serv. Wholesale Groceries, Inc.*, 2008 WL 4681917, at *3 (N.D. Ill. May 13, 2008) ("In light of [the expert witness]'s lengthy practical experience and personal observations of the wholesale cigarette industry, the Court concludes that [the expert] is qualified to testify about customs and practices in the cigarette marketing industry generally, even though he did not participate in the specific geographic market at issue in this case."); *McCloud ex rel. Hall v. Goodyear Dunlop Tires N. Am., Ltd.*, 479 F. Supp. 2d 882, 887-90 (C.D. Ill. 2007) (permitting an expert on rubber polymers and tire mechanics to opine on motorcycle tires despite his lack of specific experience with motorcycle tires, reasoning that "the problem with Defendant's argument [that the expert was unqualified due to lack of experience with motorcycle tires] is that the Defendant does not identify any relevant differences

7

between motorcycle and passenger vehicle tires that might render [the expert] unqualified to give his expert opinions in the instant matter").

Maass's report asserts that that "[t]he opinions expressed herein will address the dispute on the basis of … my observation of industry customs and standard practices regarding co-agency and commission splits." Doc. 55-2 at 2. Levin complains that Maass does not say, "I have watched 25 situations where co-agents acted and this is how they did it," Doc. 66 at 6, but Levin offers no legal support for the implausible proposition that Maass is required to quantify his experience with an exact number. Finally, Levin notes that he has a rebuttal expert, *id*. at 10, and if there are defects in Maass's testimony about co-agent arrangements, then Levin should be able to undermine that testimony at trial in accordance with the usual adversarial process, whether through his rebuttal expert's testimony or through cross-examination of Maass. *See Gayton*, 593 F.3d at 616 ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination.") (citing *Daubert*, 509 U.S. at 596).

Levin argues that Maass's co-agent custom and practice opinions are inadmissible because "industry custom and practice is relevant only when determining the meaning of an ambiguous contract term." Doc. 55 at 10. The court need not consider at this time whether or not the Agreement is ambiguous because Maass's custom and practice opinions are relevant to another aspect of this suit: Grecian's counterclaim for a declaration that Levin is entitled at most to a five percent commission. 2013 WL 2403642, at *16-17 (discussing that counterclaim). To prevail on that counterclaim on an estoppel theory, Grecian must show that Levin knowingly led him to believe that Grecian would owe only five percent to Levin and ten percent to Fishman, and that Grecian reasonably relied on that belief. *Ibid*. Opinion evidence that the standard

8

practice in the industry is for co-agents to split a fifteen percent commission, and that Levin and Fishman in fact worked as co-agents, plainly is relevant to whether such a belief on Grecian's part would have been reasonable. Maass's opinions on those topics therefore are admissible without regard for whether they are also relevant to interpreting the Agreement.

Levin also argues that industry custom or practice is inadmissible in the absence of evidence that the parties were aware of that practice at the time of the events at issue. Doc. 55 at 9-10. Testimony about the general custom and practice of the publishing industry has bearing to the estoppel theory underlying Grecian's second counterclaim only if Grecian was subjectively aware of that custom and practice at the time of the events at issue. This potential obstacle to Maass's testimony goes not to his qualifications or to the reliability of his opinions, but merely to their relevance—that is, to whether the opinions "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. On that point, Levin says that "Grecian has unequivocally stated that he 'had no experience in dealing with publishers or agents' at the time he signed the Agreement,' so he could not have relied on custom and practice when he signed the Agreement." Doc. 66 at 7 (citation omitted). The relevant time period for Grecian's estoppel theory, however, is not the time when the Agreement was signed in 2004, but the time when Levin began working with Fishman in 2010, and Levin submits no evidence as to what Grecian knew about literary co-agent custom and practice as of 2010. If Grecian offers at trial direct or circumstantial evidence that he was aware of that custom and practice at that time, then Levin may undertake to rebut that evidence. If Grecian does not offer such evidence, then Levin may reassert his objection that Maass's custom and practice opinions are inadmissible as irrelevant. *See In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) (in a bench trial, "the court does

not err in admitting the [expert] evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of … Rule 702").

Finally, Levin submits that Maass's opinions on literary co-agent custom and practice should be excluded because "Maass admits [that] the Agreement is not a literary agent's agreement." Doc. 66 at 5. That argument is an unpersuasive nitpick. When asked at his deposition whether the Agreement contained language "usually present in literary agent agreements," Maass answered that "[t]he precise wording here is not the same as I've ever seen in literary agency agreements, but the scope of the representation is, with one exception, the same." Doc. 55-3 at 28. Whether or not the Agreement conforms to the Platonic ideal of a literary agent agreement, Maass's opinions on literary co-agent custom and practice are relevant to the parties' dispute regarding the relationship created by the Agreement, and Levin may attempt to rebut those arguments at trial through the usual adversarial process.

For these reasons, Maass's literary co-agent custom and practice opinions are admissible. But Maass's "standard of care" opinions are inadmissible. On that point, Grecian argues: "Not only will Maass' testimony as [to] the custom and practice of the publishing industry help 'amplify' the terms of the Agreement, it will also help provide context as to the standard of care ordinarily employed by agents in the publishing industry. Such testimony is relevant both as to Levin's claim that he fulfilled his duties under the Agreement, and to Grecian's counterclaims that Levin failed to fulfill his duties. … Maass is clearly qualified to describe the scope of such duties and to opine [on] whether Levine [sic] fulfilled those duties. In his report, Maass opined that Levin did not fulfill those duties." Doc. 63 at 11-12. The court interprets this to mean that Grecian wants Maass to offer opinions regarding whether Levin materially breached the Agreement by failing to fulfill his "duty to use his best efforts to promote and sell Grecian's

work to publishers and others." 2013 WL 2403642, at *6-7 (discussing this contractual duty of Levin's).

The problem, as Levin correctly points out, is that "such testimony is nowhere described in Maass' Report." Doc. 66 at 9. All that the report offers on that topic is the following: "As to the defendants counter-claim of breach of contract by Levin for failure to fulfill his responsibilities as agent, my opinion is that Levin's efforts on behalf of Grecian's literary works were minimal until a juicy potential book deal arose through some co-agent work with another agent designed to sell not a novel, actually, but a graphic novel. Essentially, Levin lucked into a sweet book deal." Doc. 55-2 at 10-11. This conclusory statement, and any opinion based on that statement, must be excluded because Maass has failed to connect his conclusion to his experience such that the court can find the conclusion to be a reliable application of that experience. *See Clark v. Takata Corp.*, 192 F.3d 750, 759 (7th Cir. 1999) (affirming the exclusion of expert testimony where the expert's opinion was "connected to existing data only by the *ipse dixit*, or bare assertion, of the expert," and noting that "[w]here the proffered expert offers nothing more than a 'bottom line' conclusion, he does not assist the trier of fact"); *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) (affirming the exclusion of expert testimony where no evidence backing the expert's conclusion was presented to the court). Perhaps Maass's extensive experience qualifies him to offer opinions on what a literary agent must do to exercise his "best efforts" to sell his client's works, but because he has offered no opinion beyond the bare conclusion that Levin fell short, he will not be allowed to testify that Levin failed to fulfill his "best efforts" obligation.

To summarize, Levin's motion to exclude Maass's opinions is granted in part and denied in part. Maass may offer opinions on the custom and practice of literary co-agent arrangements

and on whether Levin and Fishman acted as co-agents, along with general background about the publishing industry necessary to provide context for those opinions, but he may not offer opinions on other topics.

July 12, 2013                                                                 _____
                                                                                        United States District Judge