UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KEN F. LEVIN, | ) | |
| | ) | |
| Plaintiff, | ) | 12 C 767 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| ALEXANDER GRECIAN, | ) | |
| | ) | |
| Defendant. | ) | |

**M**EMORANDUM **O**PINION AND **O**RDER

Ken Levin brought this suit against his former client, author Alex Grecian, in the Circuit

Court of Cook County, Illinois.  Doc. 1 at ¶ 2.  Count I of the complaint seeks a declaratory

judgment that the parties' representation agreement ("Agreement") (reproduced at Doc. 106) is a

valid and enforceable contract and that Grecian owes Levin fifteen percent of the money that

Grecian received for the rights to publish his novel *The Yard* and its sequels; Count II seeks

damages for anticipatory breach of contract.  Doc. 8.  After removing the suit to this court, Doc.

1, Grecian answered, asserted affirmative defenses, and filed counterclaims, Doc. 8.  The first

affirmative defense alleges that "Levin's claims are barred by his own material breaches of the

Agreement, which excused Grecian from any obligations under the Agreement."  *Id*. at p. 11.

Counts I and II of the counterclaims seek damages against Levin for breaching the Agreement

and the fiduciary duties he owed to Grecian; Count III seeks a declaratory judgment that Levin's

alleged breach of the Agreement terminated Grecian's obligations thereunder, including any

obligation to pay Levin a commission or fee; and Count IV seeks, in the alternative to Count III,

a declaratory judgment that Levin is entitled at most to only a five percent commission as the co-

agent of Seth Fishman.  *Id*. at pp. 15-17.

Levin moved for summary judgment, and the court granted the motion as to Grecian's contract and fiduciary duty counterclaims for damages, but denied the motion as to Levin's declaratory judgment claim and Grecian's declaratory judgment counterclaims.  Docs. 71-72 (reported at 974 F. Supp. 2d 1114 (N.D. Ill. 2013)).  The court then held a bench trial on both parties' declaratory judgment claims and Levin's contract claim.  Docs. 104-05, 110-13. Pursuant to Federal Rule of Civil Procedure 52(a), the court enters the following Findings of Fact and Conclusions of Law.  To the extent that any Findings of Fact may be considered Conclusions of Law, they shall be deemed Conclusions of Law, and vice versa.  After considering the admissible evidence and assessing the witnesses' credibility, the court finds that Levin materially breached ¶¶ 3-4 of the Agreement but nonetheless is entitled to a five percent commission on *The Yard* and its first sequel, *The Black Country*; a fifteen percent commission on Grecian's earlier works *Proof* and *Seven Sons*; and a 3.34 percent commission on certain foreign rights for *The Yard* and *The Black Country*, as detailed below.

### Findings of Fact

#### A.      Initial Contact Between Levin and Grecian

1.      Grecian first contacted Levin with an email on August 19, 2004, introducing himself as a "an award-winning writer, storyboard artist and illustrator" and requesting Levin's advice on how to deal with interest from two competing publishers in his comic book series proposal, *The Impossible Snowman*.  Pl. Exh. 3.

2.      Levin and Grecian maintained contact, and Grecian kept Levin apprised of the publishers he was pitching and sent Levin drafts of his pitches.  Tr. 01/21/14; Pl. Exhs. 4, 6. (Official transcripts of the bench trial have not been prepared, so citations to the transcripts reference only the day, not the page or line.)

3. In October 2004, at Levin's request, Grecian sent Levin a document describing all of his previous and current projects, as well as his career goals. Grecian's short-term goals were to have *The Impossible Snowman* published and to "place enough other material [to] begin building a real reputation as a good, reliable writer of comic books"; his mid-range goal was to "write a comic book script every week for a major publisher" like DC Comics or Marvel; and his long-term goals "include[d] seeing some of [his] work developed for film or television, publishing [his] novel and writing some spec work for TV." Pl. Exh. 5.

4. On October 26, 2004, Grecian emailed Levin a draft of a novel, *Persona*, along with a tentative query letter that Grecian hoped that Levin would forward to another literary agent, Dominick Abel. The query letter stated: "I am seeking representation for my quirky crime novel, *Persona*. I am enclosing a brief synopsis and three sample chapters, sent to my current agent, Ken Levin, to be forwarded to you." Pl. Exhs. 8, 9.

**B.     The Agreement**

5. Levin and Grecian entered into a written representation agreement ("Agreement") effective November 1, 2004. Pl. Exh. 1.

6. Paragraph 1 of the Agreement provides that Levin is the "sole and exclusive representative of all of rights to the Properties," *id*. at ¶ 1, with "Properties" defined as "[a]ll literary and/or comic art properties, and all associated intellectual property rights, which are or have been created or controlled by Alex Grecian in whole and in part as of and after the Effective Date [November 1, 2004] and all sequels and spin-offs of same," *id*. at p. 1.

7. Paragraph 2 provides that "as Alex reasonably requests, Ken shall work with Alex to formulate strategies to develop and 'take out' Properties for print publication, movie, television, and/or video game development, and respond to inquiries in respect of any Rights to

the Properties." *Id*. at ¶ 2. Paragraph 6B provides that "Ken shall have an interest of 15% in any non-comic art writing or print publication (novels, screenplays, etc.), and in third party print publishings of comic art Properties." *Id*. at ¶ 6B.

8.   Paragraph 3 provides that "Ken and Alex shall keep each other informed of any and all inquiries and discussions respecting the Properties and the rights to the Properties," and that "[e]ach agrees to let the other know of any inquiries and any potential or actual opportunities learned of related to any of the Properties, and to timely forward to the other when received any inquiries (e-mails, letters, etc.) in respect of the Properties." *Id*. at ¶ 3.

9.   Paragraph 4 provides: "No agreements for any of the Rights to the Properties or for any Services shall be entered into unless expressly approved by Alex in advance." *Id*. at ¶ 4.

10.   Paragraph 8 provides in relevant part: "Ken may from time to time recommend the strategic retention of a particular agent and/or attorney or the attachment with one or more additional producers in respect of a Property or a potential Property acquirer, but whether such agent and/or attorney is engaged or such producer is attached, and the terms of that engagement, shall be strictly subject to and dependent upon Alex's prior approval." *Id*. at ¶ 8.

11.   The Agreement's initial term was seven years, ending November 1, 2011, and it provides for automatic renewal for additional four-year periods unless Grecian sends a notice of termination to Levin "at least six months before the end of the term." *Id*. at ¶ 9.

12.   Grecian did not terminate the Agreement in writing at least six months before November 1, 2011. Doc. 87 at p. 5 ¶ 15.

13.   The Agreement is the only written agreement between Grecian and Levin. *Id*. at p. 5 ¶ 13.

14.     Based on the totality of the facts below, the court finds that Levin used his best efforts in "work[ing] with Alex to formulate strategies to develop and 'tak[ing] out' Properties for print publication, movie, television, and/or video game development, and respond[ing] to inquiries in respect of any Rights to the Properties."  Pl. Exh. 1 at ¶ 2.

15.     After entering into the Agreement, Levin helped Grecian resolve an issue with George Singley, who was interested in publishing *The Impossible Snowman*.  Levin told Grecian to let Singley know that Grecian "ha[s] a manager and Singley should be in touch with [Levin]," and Levin updated Grecian on conversations with Dan DiDio at Marvel regarding possible work-for-hire opportunities.  Pl. Exh. 10.

### C.     Levin's Efforts with AiT/Planet Lar's Publication of Grecian's *Seven Brothers* (*Seven Sons*)

16.     In early 2005, Grecian emailed pitches to Larry Young, who, along with his wife, Mimi Rosenheim, owned a small, successful publishing house called AiT/Planet Lar, which *Entertainment Weekly* dubbed "the HBO of comics."  Tr. 01/21/14; Tr. 01/22/14.

17.     When Grecian "r[a]n into a snag" in his correspondence with Young, during which Young stated he wanted to see a finished product before he could make an offer on a graphic novel by Grecian called *Seven Brothers*, Grecian turned to Levin.  Pl. Exhs. 12-13.

18.     Levin, who was also Young's long-time agent, sent Young an email calling Grecian "the real deal" and recommending that Young take another look at *Seven Brothers*.  Tr. 01/21/14.  Levin told Rosenheim that "he had a writer he thought had a really good book," *Seven Brothers*, and "he wanted [AiT/Planet Lar] to take a look at it."  Tr. 01/21/2014.

19.     In 2005, Rosenheim and Young were not actively reading submissions and would not have taken an interest in and followed through on *Seven Brothers* if not for Levin's endorsement.  Tr. 01/21/14.

20.     On February 14, 2006, Levin sent Young an email asking him to "confirm that 7 BROTHERS is a go so we can lock that up."  Pl. Exh. 14.

21.     AiT/Planet Lar ultimately published *Seven Brothers* under the title *Seven Sons* in October 2006.  The book was well-received in the comics industry, and Grecian believed that it was a "critically acclaimed" first graphic novel.  Pl. Exhs. 15, 124, 139-48.

22.     *Seven Sons* generated $3,000 in profit for AiT/Planet Lar, of which Grecian received $1,000.  Levin did not explicitly ask Grecian for or receive a commission on Grecian's earnings from *Seven Sons*.  Tr. 01/21/14.

### D.     Levin's Efforts Involving *Proof*

23.     Jann Jones from the DC Comics imprint Vertigo was impressed with *Seven Sons* and asked Grecian to send her some pitches.  Grecian sent Jones the first two issues of a comic series called *Proof* and asked Levin to speak to Jones on his behalf.  Pl. Exh. 139-36.

24.     Grecian also pitched *Proof* to IMAGE Comics, which accepted it as a monthly comic series in early 2007.  Grecian was paid less than $20,000 for the series over the three and a half years that it ran.  Tr. 01/27/14.

25.     Levin worked with his friend Jason Netter, the head of the media production company Kickstart, to try to sell a television option for *Proof* to Sony Animation.  Grecian signed an agreement with Netter and Kickstart giving Kickstart the right to option *Proof*.  Tr. 01/27/14.  Grecian agreed to have Netter bring in a writer, develop *Proof* as a TV series, and take it to Sony Animation to gauge its interest.  Tr. 01/22/14.

26.     On November 6, 2008, Grecian wrote Levin an email with the subject line, "What happened to you?"  Grecian was frustrated because he had not heard back from Levin regarding

the *Proof* media pitch efforts, even though he had been promised an update in September.  Def. Exh. B.

27.    Shortly after receiving the email, Levin called and apologized, explaining that his son had suffered from a medical emergency.  Tr. 01/27/14.

28.    Grecian testified that he asked to be "let out of the contract" because he was disappointed that Levin "hadn't sold anything for" Grecian, to which Levin responded that "he would rather not [end the contract]" and promised to work harder for Grecian.  Tr. 01/27/14.

29.    On May 6, 2009, Adam Goldworm, a film producer, emailed Grecian expressing interest in developing *Proof* into a television series.  Grecian forwarded the email to Levin, and Levin responded: "Double-checked tonight to make sure we still have a deal—SONY says we do, they're just figuring out financing in the brave new world."  Def. Exh. C.

30.    On May 8, 2009, Levin emailed Goldworm: "Thanks for the inquiry.  PROOF is already in development."  Def. Exh. D.

31.    The *Proof* deal with Sony ultimately did not materialize.  Levin testified: "*Proof* wasn't really ideal to develop because of its contents, for television or film.  But nonetheless, I spent a great deal of time giving it a shot and got Kickstart to do the same, which I appreciated. It turned out to be a great deal of time spent with no tangible result, but that's part of the … territory."  Tr. 01/22/14.

32.    On November 21, 2010, Grecian emailed Goldworm to ask if he "ever got a chance to talk to Ken" and attached an issue of *Proof*.  Goldworm responded: "Ken kind of disappeared on me.  I still love this book and would love to take it out as a series.  I thought you guys had lost interest."  Def. Exh. J.

33.     On March 30, 2011, Goldworm contacted Grecian in an attempt to become the exclusive media representative for *Proof*.  Grecian responded that he "would really prefer that business dealings be conducted through Ken," and copied Levin on the response.  Pl. Exh. 81.

34.     That same day, Grecian emailed Levin and an employee from Kickstart, stating that he was confused as to what was going on with Goldworm.  Grecian wrote: "To be honest, while I was aware that Kickstart was still interested in Proof (and you've most definitely put in a lot of time on this project), I haven't been sure about what's going on over there either."  Def. Exh. K.

### E.      Initial Contact Between Levin and Seth Fishman

35.     In Spring 2009, Seth Fishman, then an assistant literary agent with the New York firm Sterling Lord Literistic, called Levin and asked if one of Levin's clients, the comic artist Garth Ennis, would be interested in publishing a prose novel.  Tr. 01/21/14.

36.     Although Ennis was uninterested, Levin followed up and asked Fishman if Sterling Lord would be interested in adapting comic work into prose generally, suggesting that Levin's client Bill Willingham would be a good candidate.  Tr. 01/21/14.

37.     Fishman agreed to work with Levin to publish Willingham's novel, *Down the Mysterly River*.  The agreement was that ten percent of the publishing profits would go to Sterling Lord.  Tr. 01/21/14.

38.     Levin testified that Willingham verbally agreed to pay fifteen percent of the sale proceeds to Levin on top of the ten percent to Sterling Lord.  Tr. 01/21/14.  By contrast, Fishman testified that fifteen percent is typically the standard fee for a literary agent, and that for the Willingham deal he split that fifteen percent with Levin (ten percent to himself, five percent to Levin) because he was "bearing the brunt of the literary side of things."  Tr. 01/24/14.  This

dispute is immaterial, for whatever fee deal Levin struck with Willingham does not bear on the deal he struck (or did not strike) with Grecian.

39.     Fishman suggested a few edits and submitted *Down the Mysterly River* to imprints at New York publishing houses.  An imprint of Macmillan called Tor Books bought the Willingham book for an advance of $60,000.  Tr. 01/24/14.

40.     After the sale of the Willingham book, Levin, on behalf of his company NightSky Entertainment, wrote Fishman a check for ten percent of $60,000.  Tr. 01/24/14.

### F.     Levin's Efforts Regarding the Graphic Novel Initiative and Early Stages of *The Yard*

41.     On July 31, 2009, Grecian emailed Levin a proposal for a graphic novel called *The Yard*.  Pl. Exh. 141-1.

42.     Grecian sent the proposal for *The Yard* to Vertigo several times, but was turned down.  Tr. 01/22/14.

43.     In December 2009, Levin developed the idea of the "Graphic Novel Initiative" in which NightSky and Sterling Lord—spearheaded by Levin and Fishman—would team up to pitch promising material to New York publishers interested in graphic novels.  Levin suggested that Grecian's proposal for *The Yard* be included among several projects by his other clients.  Tr. 01/22/14.

44.     In December 2009, Levin spoke to Grecian about including his proposal for *The Yard* in the Graphic Novel Initiative.  Levin told Grecian the back story of how Fishman first approached Levin regarding Ennis and how Fishman later worked with Levin to sell *Down the Mysterly River*.  Levin testified: "I was asking if [including the proposal for *The Yard* in the Graphic Novel Initiative] was okay with him.  I told him if [a sale] happened, we would owe Fishman and his firm, then Sterling Lord, 10 percent.  He would still owe me my 15 percent, but

the dollars would be good enough that even splitting it with Riley [Rossmo, the illustrator for *The Yard*], economically, I thought it would be a good thing." Tr. 01/22/14. Levin testified that Grecian responded something to the effect of, "That sounds great. Absolutely. Let's do it." Tr. 01/22/14.

45.     Levin did not send a confirmatory email to Grecian regarding Grecian's supposed agreement that Fishman could take a ten percent fee on top of Levin's fifteen percent fee. Tr. 01/22/14. In fact, Levin admitted that no written communication between Levin and Grecian set forth this supposed understanding. Tr. 01/23/14.

46.     Based on the manner of the witnesses while testifying and for the additional reasons set forth below, the court does not find credible Levin's testimony that he informed Grecian of the "fifteen plus ten" fee structure and that Grecian agreed to it.

47.     Grecian testified that he agreed to have Fishman brought on as his literary agent and to represent him to New York publishers as part of the Graphic Novel Initiative. However, Grecian denied that Levin ever told him that he would have to pay a ten percent fee to Fishman on top of a fifteen percent fee to Levin. Tr. 01/23/14. Based on the manner of the witnesses while testifying and for the additional reasons set forth below, the court finds credible Grecian's testimony that Levin never informed him of the "fifteen plus ten" fee structure.

48.     On January 5, 2010, Levin emailed Grecian with revisions of the proposal for *The Yard* and followed up several times. Pl. Exhs. 141-3, 141-4, 141-5.

49.     On January 8, 2010, Levin told Grecian that he planned to pitch *The Yard* to a publisher in New York, and was eager to receive Grecian's "edit of [Levin's] edit." Pl. Exh. 141-10. Grecian sent the revised pitch later that day. Pl. Exh. 141-11.

50.     On January 12, 2010, Levin sent Fishman the proposal for *The Yard*.  Fishman

responded, "This is stellar," but expressed concern that New York publishers may "greet[]" the

"format … oddly," a reference to the fact that the publishers were not accustomed to seeing

proposals for graphic novels, as opposed to prose novels.  Def. Exh. E.

51.     On January 26, 2010, Grecian emailed Levin for advice on an upcoming phone

conversation with Vertigo regarding a comic proposal.  Levin responded with his thoughts, and

he informed Grecian that Levin had meetings lined up with four of the biggest publishing houses

in New York regarding *The Yard*.  Pl. Exh. 141-12.

52.     In February 2010, Levin and Fishman met with literary agents from four major

publishing houses to pitch several graphic novels, including *The Yard*.  Levin ran the meeting.

No house made an offer, although *The Yard* was well-received.  Tr. 01/22/14.

53.     Levin remarked to Fishman after the meeting: "If that had been a meeting for a

prose novel, I would have sold [*The Yard*] in the room."  Fishman agreed.  Tr. 01/22/14.

54.     Soon thereafter, Levin called Grecian, who was at home in Kansas, to update him

on the meeting and to ask whether he would consider writing *The Yard* as a prose novel instead

of as a graphic novel.  Levin told Grecian that "if you, Alex, would write this as a prose novel, I

think it would sell."  Tr. 01/22/14.

55.     Grecian was initially hesitant because he did not want to invest considerable time

into writing a prose novel from scratch and risk having it not sell.  Tr. 01/22/14.  Eventually,

Grecian agreed to write *The Yard* as a prose novel.  Tr. 01/22/14.

56.     Levin testified that in the course of persuading Grecian to write *The Yard* as a

prose novel, he told Grecian that the sale of a prose novel would be "substantially [more] on a

net basis than what [they had] ever been talking about previously for a publication."

Additionally, Levin testified that he "reminded [Grecian] of the conversation [they] had regarding Fishman and said, you know, remember, if … you do this and we work with Fishman, he and his agency are going to get 10 percent. I will still get 15 percent." Tr. 01/22/14. Grecian, by contrast, testified that Levin never reminded him of any "fifteen plus ten" fee arrangement at that time. Tr. 01/27/14. Based on the manner of the witnesses while testifying and for the additional reasons set forth below, the court does not find credible Levin's testimony that he reiterated the "fifteen plus ten" fee arrangement to Grecian.

57.     On March 30, 2010, Levin emailed Dominick Abel, the agent in whom Grecian years earlier had expressed interest, and asked him to look at *Paradise Flats*, one of Grecian's prose novel manuscripts. Pl. Exh. 17. Abel responded two weeks later and declined to take on the novel. Pl. Exh. 18.

58.     On April 12, 2010, Levin sent Fishman the manuscript of *Joyride*, another one of Grecian's prose novels. Def. Exh. F. Fishman responded, "[Y]ou were right, he can write novels." *Ibid*. On April 27, 2010, Levin sent Fishman *Paradise Flats*, which Fishman liked as well. Def. Exh. G.

59.     On April 14, 2010, Grecian emailed Levin for his review the first chapter of *The Yard*, an outline, and two of Rossmo's accompanying illustrations. Pl. Exh. 141-15.

60.     On May 5, 2010, Grecian emailed Levin asking when he needed a partial draft of *The Yard*. Levin encouraged Grecian to keep writing, and suggested that Rossmo compose the cover art in a "steampunk" style. Pl. Exh. 141-16.

61.     On May 6, 2010, Levin gave substantive, plot-related feedback to Grecian on his draft of *The Yard*. Pl. Ex. 141-19.

**G.** **Levin's Efforts Regarding Mulholland's Offer on a Partial Draft of** *The Yard*

62. In May 2010, John Schoenfelder of Mulholland Books, an imprint of Hachette, sought out Fishman for a routine industry lunch, during which Fishman told him about *The Yard*. Tr. 01/24/14.

63. Fishman emailed Schoenfelder an excerpt of *The Yard* on May 11, 2010. Def. Exh. I.

64. Around May 25, 2010, Schoenfelder, Fishman, and Levin had a meeting to discuss *The Yard*. Schoenfelder indicated that Mulholland was interested in a two- or three-book deal, and Fishman and Levin stated that it would be ideal if an offer could be made prior to Grecian producing a completed manuscript. Tr. 01/22/14.

65. Schoenfelder emailed Fishman on August 13, 2010 regarding the excerpt of *The Yard*, stating that "[t]he pages are AMAZING" and that Rossmo's art was "mind blowing." Schoenfelder told Fishman that he would seek approval to acquire the book before Grecian completed it. Fishman forwarded this email to Levin. Def. Exh. I.

66. Levin in turn forwarded the Schoenfelder email to Grecian, and Grecian responded to both Fishman and Levin: "Thank you, gentlemen! I'm raising a glass to you." Pl. Exh. 140-28.

67. On August 24, 2010, Fishman informed Levin that Schoenfelder had made a "crappy" offer of $10,000 for North American rights to the first book in the *The Yard* series, in paperback. Fishman's initial thoughts were to ask for $25,000 or to wait until the book was complete to receive a higher offer. Levin responded that "10k is insulting" and that the book should be published in hard cover. Pl. Exh. 114.

68.     Levin spoke to Schoenfelder and expressed his disappointment over the offer. Schoenfelder agreed that the book was worthy of hard cover and asked Levin to send him the completed manuscript when it was ready, assuring Levin that Mulholland would make a higher offer at that time.  Tr. 01/22/14.

69.     Levin then told Grecian about Mulholland's $10,000 offer.  Grecian wanted to take it, but Levin responded that it was not in the best interest of Grecian's career to accept such a low offer.  Levin explained that if an author "start[s] as a $10,000 writer," it "pegs [him or her] as a $10,000 writer."  Levin elaborated that if "you start as a hard back writer and you deliver, you'll have the opportunity to stay as a hard back writer," while "if you start as a trade paperback writer, you're swimming upstream in terms of [your] overall career."  Tr. 01/22/14.

70.     Grecian agreed to decline the $10,000 offer, with the understanding that Schoenfelder would make a higher offer upon receiving a completed manuscript.  Tr. 01/22/14.

71.     On September 22, 2010, Grecian sent an email to Levin thanking him for his call and updating him on progress on *The Yard*.  Grecian wrote, "Lemme know what you learn from Seth.  Whatever you guys decide we need to do, I'm in."  Pl. Exh. 78.

72.     On December 3, 2010, Fishman left Sterling Lord for the Gernert Company, where he would be a literary agent.  Sterling Lord allowed Fishman to take the Bill Willingham property (*Down the Mysterly River*) with him to Gernert.  Levin told Grecian that Fishman "got offered (and took) a full agent position at The [Gernert] Company – a big time agency (John Grisham, etc.) and stronger than Sterling Lord," noting that "[t]his is a plus for us."  Pl. Exhs. 27-28; Tr. 01/22/14; Tr. 01/24/14.

### H.     Levin's Further Efforts in Selling *The Yard*

73.     Around late April 2011, Grecian completed the manuscript of the prose novel *The Yard*.  Tr. 01/22/14.

74.     Fishman submitted the manuscript to thirteen New York publishers, including Mulholland.  He sent a list of the publishers to Levin on May 4, 2011.  Def. Exh. L; Tr. 01/22/14.

75.     Several publishers scheduled phone interviews with Grecian to attempt to persuade him to sign with their houses.  Grecian called Levin to inform him of his upcoming interviews, and he called Levin after his interviews to report how they went.  Tr. 01/22/14.

76.     Grecian emailed Levin on May 9, 2011, copying Fishman, and reported that he liked "Josh at Viking and Marysue [Rucci] at Putnam best."  Pl. Exh. 83; Tr. 01/22/14.

77.     Levin and Fishman agreed to hold an auction for *The Yard*, with Fishman in charge of setting up and conducting the auction.  Tr. 01/22/14.

78.     On May 10, 2011, Grecian sent an email to Levin stating: "I think all three of us have good reason to feel pretty damn proud of ourselves right now.  And I appreciate your faith in me."  Pl. Exh. 140-39.

79.     On May 12-13, 2011, Fishman conducted a two-day auction among seven publishers.  Fishman gave Levin regular updates.  At the auction's close, two publishers ended up with the highest bids of a $500,000 advance for North American rights to *The Yard* and one sequel.  Tr. 01/22/14.

80.     Levin and Fishman talked to Grecian afterwards.  They all slightly favored working with Marysue Rucci at Putnam, one of the two highest bidders, and Grecian decided to accept Putnam's offer.  Tr. 01/22/14.

81.     On May 13, 2011, Rucci emailed Grecian and Fishman to congratulate them on the deal, and Fishman copied Levin on his reply, stating: "I'd like to add Ken Levin, my co-agent to these threads. … [W]e work closely with one another on Alex's projects." Pl. Exh. 86.

### I.     Levin's Media Deal Efforts Involving *The Yard*

82.     Prior to the auction, Levin sought to gauge interest in *The Yard* from three media producers, Gil Netter (of Disney), Peter Chernin (of The Chernin Group), and Neil Moritz (of Sony). Gil Netter and Chernin liked *The Yard* but believed it was better suited for television, which was not their area of interest at the time. Moritz, who worked with Sony Television, was interested in adapting *The Yard* for television. Tr. 01/22/14.

83.     On May 11, 2011, Levin emailed Jason Netter (of Kickstart) informing him that *The Yard* had been sent to top publishers by his "book co-agent, David Gernert's company," and that "four film scouts have already inquired." Levin attached a draft of an email to Gil Netter, Jason's uncle, regarding adapting *The Yard* for television or film. Pl. Exh. 85. Levin admitted that he probably did not inform Grecian about the film scout inquiries. Tr. 01/27/14.

84.     The May 11, 2011 email also noted that "Jason [Netter] and I [Levin] are the only producers attached to the film rights, and I [Levin] control them." Pl. Exh. 85. At trial, Levin admitted that he did not obtain Grecian's approval for attaching Jason Netter to the film rights. Tr. 01/27/14.

85.     At some point, Charles Smolenski of Sony Television asked Levin to hold off on entertaining other offers for two months to give Sony the time to look into whether it wanted to go forward with a deal. Levin agreed to this without asking for or obtaining Grecian's permission. Tr. 01/22/14; Tr. 01/27/14.

86. Grecian testified that, around that same time, Levin called to say that he had "given a free option on the book to Sony [Television]," which Grecian remembers "had disappeared on the *Proof* deal." Grecian was upset because this "tie[d] up the book" at a time when "there was a lot of buzz" surrounding it. Grecian also testified, truthfully and consistently with Levin's testimony, that he was never informed that Levin had received inquiries from the other film scouts regarding *The Yard*. Tr. 01/27/14.

87. On May 25, 2011, Jason Netter and Levin discussed media deal efforts for *The Yard*. Levin said that "Josh of Ch[e]rnin has kept calling Gernert Co to talk to my co-agent," referring to Fishman. Levin added: "Before we take one more step with these people, we need to find out if we would have the backend piece we want if we partnered w[ith] them, and the front end and credits too. … I developed this material and also want a producer credit here, this is the time to try to strengthen that position for two fee futures." Def. Exh. N.

88. Grecian did not at any time retain Jason Netter or agree that he would have film rights to *The Yard*. Levin did not discuss with Grecian the possibility of Jason Netter's having film rights before Levin agreed that Jason Netter would have these rights. Despite this, Levin represented to Gil Netter that Jason Netter had film rights to *The Yard*. Tr. 01/22/14.

89. On October 11, 2011, Alex Block, a development executive for Akiva Goldsman, a Hollywood producer, asked Levin for a manuscript of *The Yard*. Levin declined, explaining that "the rights are tied and the manuscript dissemination restricted." Def. Exh. X. Levin did not inform Grecian of Block's inquiry, and Grecian did not approve of Levin's declining Block's request. Tr. 01/27/14.

90.     On October 19, 2011, Jason Netter emailed Levin informing him that "Sony will contact [Levin] about the Yard deal for 60 days," and Levin responded, "[I]s it a free deal and that's it, or is it free and negotiate the rest, or …?"   Def. Exh. Y.

91.     On October 21, 2011, Levin met Grecian in person in Kansas City.  Grecian credibly testified that during this meeting, Levin did not discuss the media inquiries from Chernin or Block/Goldsman.  Tr. 01/27/14.

92.     On November 29, 2011, Levin emailed Jason Netter, stating that "there's been three more inquiries of rights [for *The Yard*] and [he had] heard nothing back from Charles Smolenski at SONY since [their] initial discussions – is that still live?"  Def. Exh. BB.  Levin never informed Grecian about those inquiries or his exchange with Jason Netter.  Tr. 01/27/14.

93.     The court finds that Levin failed to communicate with Grecian regarding the extent of his media efforts regarding *The Yard* and expressions of media interest in the property. The court also finds that Levin failed to obtain Grecian's approval before giving a "free option" to Sony Television.

### J.     Levin's Involvement in the Putnam Contract

94.     Around May 16, 2011, Putnam sent Levin a deal memo asking for publishing rights for all formats, including a graphic novel format.  Levin convinced Putnam that Grecian should retain the graphic novel rights.  Tr. 01/22/14.

95.     On May 19, 2011, Levin sent Fishman additional notes on the Putnam deal memo, including the accounting treatment of *The Yard* and *The Black Country*, trade paperback royalties, and Levin's desire that Putnam include more milestones so that Grecian could receive his money sooner.  Pl. Exh. 117.

96.     On May 21 and 22, 2011, Grecian asked Levin for input on the revisions he planned to make to *The Yard*, and Levin responded with notes.  Pl. Exh. 87.

97.     On July 19, 2011, Putnam emailed Fishman the first draft of the Putnam contract. Fishman forwarded it to Levin on July 25, 2011 to "look over as best you can."  Def. Exh. Q.

98.     On August 22, 2011, Paula Breen, the Gernert Company's counsel, sent Fishman her comments on the Putnam contract for Levin's review.  She told Fishman: "I will need to know [Levin's] contact information as he should be added to the Agreement as co-agent." Fishman forwarded the email to Levin, who responded that he would take a look that week.  Def. Exh. R.

99.     Fishman, having not heard back from Levin on the Putnam contract, emailed him on August 29, 2011 and September 8, 2011 asking about the contract.  Def. Exhs. S, U.

100.    Levin testified that in Fall 2011, he was distracted because his wife had medical problems and that he phoned the Mayo Clinic in Minnesota at least twice daily on her behalf.  Tr. 01/22/14.

101.    On September 3, 2011, Grecian referred his friend, Jai Nitz, to Levin.  Pl. Exh. 140-42.

102.    On September 6, 2011, Fishman asked Grecian whether he had emailed Levin regarding the agent fees (of which more below), and Grecian replied that Levin had said that he would call Grecian the next week.  Pl. Exh. 91.

103.    On September 23, 2011, Grecian emailed Levin asking to be "kept in the loop on where the [Putnam] contract is and what our progress is," noting that it had been "four months since the book sale."  Pl. Exh. 94.

104.    On September 27, 2011, Fishman emailed Grecian regarding the delay with the Putnam contract.  Fishman stated: "What is your exact relationship with Ken? … Ken brought you to me, and he's your primary agent, and he's also a lawyer who will have thoughts on the contract."  Pl. Exh. 96.

105.    The same day, Levin called Grecian.  Grecian then emailed Levin thanking him for the call: "It was good to finally talk to you and hear from you what's going on.  I do want to make sure that you understood my concerns.  From reading and talking with friends in the industry, the delays on a deal like this seem to be exaggerated at this point.  I am concerned about being paid by the end of the year."  Pl. Exh. 98.

106.    On September 29, 2011, Levin emailed Fishman his color-coded notes on the Putnam contract, consolidated with Breen's notes.  Levin did not change the language in the rider to ¶ 27 stating: "The Author agrees to an irrevocable fifteen percent (15%) commission deducted from all monies due the Author."  Instead, he added to that paragraph that "[n]inety percent (90%) of such amount [all payments under the contract]" would go to NightSky (Levin's agency), and "[t]en percent (10%) of each such amount" would go to Gernert.  Pl. Exh. 118.

107.    On October 4, 2011, Fishman emailed Grecian that "[w]e're all good with the notes [on the Putnam contract]," and that "[w]e are going to have it set up so that the payments are split – 10% goes straight to Gernert and 90% goes to Ken.  In the contract it will state that he receives 5% and you 85% so he then will disburse the other 85% to you.  I believe that's the way it's all set up – not 100% sure what your deal with Ken is."  Pl. Exh. 31.

108.    The same day, Breen emailed Putnam, copying Fishman and Levin, with comments on the Putnam contract, including the addition of this language in the rider to ¶ 27:

"Ninety percent (90%) of each such amount (representing Eighty-five percent [85%] to the Author and Five percent [5%] to NightSky Literary)."  Pl. Exh. 60.

109.    In the meantime, Levin testified that he was actively negotiating foreign rights to *The Yard*.  Tr. 01/23/14.  On June 6, 2011, the United Kingdom rights were sold to Penguin Group UK for $78,209.02.  Pl. Exh. 128; Tr. 01/23/14.  On June 17, 2011, *The Yard*'s Russian rights were sold for a $3,000 advance to imprints of ASTREL Ltd., and AST Publishers.  Pl. Exh. 88.  On July 7, 2011, *The Yard*'s Hebrew rights were sold to Kinneret-Zmora-Dvir Publishing House Ltd. for a $2,000 advance.  Pl. Exh. 89.

110.    On October 11, 2011, Levin sent Grecian his edits on a marketing piece for *The Yard* and advised him on marketing strategy for *The Yard* in the United Kingdom.  Pl. Exh. 36.

111.    On November 2, 2011, Jennifer Uram of Putnam sent Breen an email with notes on the contract; the email copied Levin and Fishman.  Putnam retained the language regarding the 85/5 percent breakdown between Grecian and Levin that Breen had proposed in her October 4, 2011 email.  Pl. Exh. 60.

112.    On November 11, 2011, Fishman forwarded to Grecian Breen's and Putnam's notes to the contract, including Breen's language regarding the 85/5 percent breakdown between Grecian and Levin.  Pl. Exh. 60.

113.    On November 14, 2011, Fishman emailed Grecian the updated Putnam contract, which deleted NightSky from the rider to ¶ 27.  Pl. Exh. 62.

114.    On November 16, 2011, Grecian emailed Fishman, requesting that "unless Gernert is legally obligated to continue sending the Putnam contract to Ken or to continue including him in any negotiations regarding me or my contract, please do not include him any further."  Pl. Exh. 64.  Fishman then forwarded Grecian's email to Breen, who responded that

she "wouldn't advise cutting off contact with Ken Levin [y]et." Pl. Exh. 63. Fishman forwarded Breen's response to Grecian, noting that he would not share Grecian's and Levin's Agreement with Breen "unless [Grecian] want[ed]" him to do so. *Ibid*.

115. On November 16, 2011, Fishman emailed Levin with the subject line, "Contracts via you and me." Fishman stated that he "thought it would be helpful for us and our counsel to outline my understanding of the commission which The Gernert Company will receive with respect to THE YARD and BLACK COUNTRY … 1. Publication Rights. The Gernert Company will receive 10% of 100% of all sums payable to Alex under all publishing agreements for the books. … [T]he balance will be paid to NightSky and/or Alex as you mutually agree." Def. Exh. DD.

116. On December 13, 2011, Levin finally responded to Putnam's notes on the contract from November 2, 2011. Levin made a few comments, including: "B. Have the payment language read as follows: [10% to Gernert: 90% to NightSky]," as opposed to Breen's language reflecting the 85/5 percentage breakdown between Grecian and Levin. Levin stated that "if this covers everything and looks OK you don't need to return my last call and let's expedite with Jennifer [Uram of Putnam]!" Pl. Exh. 119.

117. On December 14, 2011, Levin emailed Fishman with the subject line: "1/ did you send Paula [Breen] the Penguin graphic novel clause? 2/ did you see my email to her?" Pl. Exh. 120. Fishman replied: "I did. I think we're good!" Pl. Exh. 121.

118. Levin did not follow up any further to ensure that his proposed change regarding the fee percentages was adopted in the final contract. Tr. 01/23/14.

119. On February 13, 2012, the Putnam contract was officially finalized, and it did not include any language regarding payment to NightSky. It stated only that "[a]ll monies payable to

[Grecian] under all literary publishing agreements for the Books … shall be paid to The Gernert Company [which would receive 10%]," and included the proceeds from *The Black Country* along with *The Yard* "to cover bases."  Pl. Exhs. 75-76.

120.    The court finds that Levin's testimony that he had previously received Grecian's approval of a ten percent fee to Fishman on top of a fifteen percent fee to Levin inconsistent with Levin's behavior regarding Breen's October 4, 2011 addition of the 85/5 percent breakdown between Grecian and Levin.  Levin did not act with a sense of urgency to correct Breen's language, but rather delayed several weeks before proposing any change.

121.    Levin explained on the stand that he did not notice the 85/5 language "at the time" he received Breen's October 4, 2011 email adding it, but that is impossible to believe.  Tr. 01/23/14.  This was an extremely large deal for Levin, and he certainly would have noticed something as significant as a provision giving him a five percent fee, particularly given his contemporaneous fee-related discussions with Grecian, which are summarized below.

122.    Had Levin truly established with Grecian that he would receive fifteen percent on top of Fishman's ten percent, Levin would have made much quicker and energetic effort to see that this fee breakdown was reflected in the Putnam contract.  The court finds that Levin's hesitation reflects and reveals his realization that he had not in fact obtained Grecian's approval of the "fifteen plus ten" fee structure for Levin and Fishman.  The court understands that Levin was dealing with his wife's medical issues at the time, but it would have taken hardly any time and effort for Levin to address the very significant fee issue in a timely manner.

### K.    Discussions Regarding the Fee Structure

123.    On May 19, 2011, Fishman replied to an email with questions from Grecian.  In response to the question, "When might we expect a contract?," Fishman wrote: "I'd say we'd

receive a contract in a week or two, and then I, Ken and the Gernert Company's lawyer will create responses and negotiate, and that USUALLY takes 3-4 weeks. Then you sign, and they send a check, another 2-4 weeks." Grecian also asked: "What is my relationship with the two of you? Are you an agent team on my work going forward? … Do you split duties somehow? I'd like to be aware." Fishman responded: "While we have something worked out, Ken and I are both here for you. I know you want something more specific, and we'll get you something, just let me and Ken chat and be back to you in a moment. The most important thing to note is that heck no – we don't sign clients for one-offs. We sign 'em and hope to work with them forever. I can't wait for books 3, 4, 5, 6, 7, and on." Fishman copied Levin on the reply but did not consult him before sending it. Def. Exh. M.

124.     On August 31, 2011, Grecian emailed Fishman about fees: "But speaking of your stake, I'm still confused by all that because of the relationship between you and Ken. I don't mean to be crass, and of course you guys certainly earned the hell out of your commission, but I'd like to know what that is, y'know?" Fishman responded: "As to commission – The total commission that comes off your books is per usual, 15%. Anything more would be criminal! Ken and I split that, in a manner that's appropriate. As to film, Ken handles that side of it." Fishman also noted that "it might be good [for Grecian] to email him [Levin] with me [Fishman] cc'd, a blank email ([i].e., not with this thread attached))." Pl. Exh. 90.

125.     On October 14, 2011, Grecian sent Fishman a copy of his Agreement with Levin, noting: "[N]othing seems onerous to me, except maybe the amount of time I was locked down, but even that's not so bad since everything's happened at the end of the contract here and wouldn't have if I'd jumped ship. What do I have to complain about? And it seems like he only left himself four percent, but I'm cool with five." Fishman responded: "It is confusing what he

gets for this book – 15% after my cut, or before my cut?  Or just the 5% (as I take 10%)."

Grecian responded: "Well, none of that's good."  Pl. Exh. 40.

126.    In the same October 14, 2011 email thread between Grecian and Fishman,

Grecian stated that he would have to email Levin for clarification, which "is gonna be tricky,

without making him think I want to sever the relationship or that I'm trying some sort of end-run

around him."  Pl. Exh. 38.

127.    On October 17, 2011, Grecian sent Fishman a draft email to Levin, which listed

his concerns about the Agreement.  Fishman provided comments on the draft.  Pl. Exh. 41.

128.    On October 18, 2011, Grecian emailed Levin about his concerns, prefacing them

with: "You probably know I've been confused by some aspects of our relationship for quite

awhile, but I've never really pressed you for answers because there was no urgency."  Grecian's

concerns were twofold: (1) the duration of the Agreement was "onerous"; and (2) Grecian was

"unclear about what [Levin's] share [of agent fees] is" and could "read the contract as meaning

either four percent or fifteen," asking if he was "correct in interpreting this as four percent on

literary sales and fifteen on Hollywood sales."  Grecian also asked Levin, "How much of [his

$125,000 signature advance] goes to you and how much to Seth?"  Levin replied, "Absolutely,

but I'm slammed till late tomorrow or Thursday … that ok?"  Pl. Exh. 43.

129.    Levin called Grecian shortly thereafter, saying that he would fly to Kansas City

on October 21, 2011 to meet Grecian for lunch.  Grecian relayed this information to Fishman on

October 20, 2011.  Pl. Exh. 44.

130.    On October 21, 2011, Levin met Grecian for lunch.  Levin also had a meeting

with another client in Kansas City.  Levin testified that he told Grecian the following about the

fees: "I said I don't understand what you're saying here.  The agreement we went over at the

time. We talked about it. I have a 15 percent interest in everything. We talked about the possibility of somebody else getting involved and them having a fee. You agreed that we bring on Fishman. … And I said we – you know, we talked about this twice. We talked about it at the time I looked for authority to bring Fishman on, that he and his firm would get 10 percent. I still get my 15 percent. We talked about it when I suggested you consider writing The Yard as a novel, which would have been a different type of involvement for Fishman, that he'd get 10 percent, I'd still get my 15 percent. And you were fine with that." Levin testified that Grecian's "response was sort of, oh, okay. There was no pushback. There was no argument. There [were] no specifics … and there was no negativity. There was no anger." Tr. 01/22/14.

131. Grecian testified that during the Kansas City lunch, Levin told him that Fishman would receive ten percent and Levin would receive fifteen percent, for a total fee of twenty-five percent. Grecian also testified that Levin did not remind him of any previous conversation regarding that fee breakdown from around the time of the Graphic Novel Initiative or when Fishman was first brought on. Tr. 01/27/14. Based on the manner of the witnesses while testifying and for the additional reasons set forth below, the court finds credible Grecian's testimony that Levin did not "remind" him during the Kansas City meeting of any previous conversation about the supposed "fifteen plus ten" fee arrangement.

132. At the Kansas City meeting, Grecian told Levin that twenty-five percent in total agent fees "seemed like a big chunk," to which Levin responded that Neil Gaiman, a successful client of his, gives sixty percent. Pl. Exh. 52.

133. Around 4:00 p.m. on October 21, 2011, Grecian emailed Fishman informing him that "Levin's end of things is 15 percent and that looks like it carries through the Yard franchise

and the Paradise Flats franchise if and when that launches.  I have no idea whether that's normal or acceptable."  Pl. Exh. 101.

134.    At 6:30 p.m. on October 21, 2011, Grecian forward Levin the cover art for *The Yard*, and Levin responded with his thoughts.  Pl. Exh. 48.

135.    On October 24, 2011, Grecian and Fishman exchanged multiple emails.  Grecian wrote: "I felt like my hands were tied Friday [October 21], in talking to Ken because I had my son with me …, I didn't want to tip my hand that you and I had talked, and I just don't have enough knowledge regarding the legality and custom of book representation ….  He told me Friday that, in exchange for fifteen percent of the advance money … he will do anything at all that I need him to do without charging me. … Did you and Ken have an arrangement in place that contradicts what I was told Friday? … I just don't want to be taken advantage of (assuming that's even happening here) if I can possibly help it."  Pl. Exh. 49.

136.    Fishman replied: "I would like to know if Ken means that he'd take 15% on top of my 10%, or if he'd take 15% and pay 10% to me.  The fact is, you've signed a deal, which is confusing and a bit different than the norm, but Ken did do quite a bit for you in this initial book deal.  He gave me the pitch for The Yard, but saw it as a book, and made you write it. … In my mind, if this was done the way Ken and I agreed, 10% to me, 5% to him, then that would be fine … I can't really think to say else but that you should find a third party independent counsel regarding this."  Pl. Exh. 49.

137.    Grecian replied: "To clarify: [Levin] said that he'll be taking fifteen percent, in addition to the ten percent that you take, for a total of twenty-five percent in agent's fees.  That's not what you told me, which is why I wanted to get more information from you before I decided what to do."  Pl. Exh. 49.

138.    Fishman replied: "25% is an incredibly high percentage. … Talk to Ken, sure. But be wary.  Get specifics.  I don't know.  The way this is supposed to work is that he get[s] 15%, of which 10% go to me and 5% to him.  That's the way co-agenting works."  Pl. Exh. 49. At trial, Fishman testified that the split for foreign rights was slightly different, to account for the fact that a foreign agent also takes a cut.  For foreign rights, an author pays a twenty percent commission, with ten percent going to the foreign agent and ten percent to the U.S. agents, who then split that ten percent along the lines of their original fee agreement.  Thus, for Fishman and Levin "it was 6.66 percent to the Gernert company and [3.34 percent] to NightSky."  Tr. 01/24/14.  The court finds that testimony credible.

139.    On October 26, 2011, Grecian sent Fishman a draft email to Levin stating that Grecian was not comfortable paying a total twenty-five percent agent fee.  Pl. Exh. 53.

140.    The same day, Grecian told Fishman that he sent an email to Karen Shatzkin, a lawyer referred by Fishman, and that Shatzkin told Grecian that she would find him a lawyer in Kansas or, if she could not find one, would represent Grecian herself.  Pl. Exh. 54.

141.    On October 27, 2011, Grecian emailed Levin: "I've given a lot of thought to our conversation of last Friday [October 21] and am deeply disturbed by what I perceive to be discrepancies between my understanding of the way the book industry works and what you told me. … You and Seth co-agented for me on my Putnam deal.  I'm very grateful to you both, but an agent's fee is generally fifteen percent and I was under the impression that you and Seth would split that fee.  But unless I misunderstood you (which is certainly possible), you intend to take fifteen percent on top of Seth's percentage. … I feel that's unacceptable. … Please advise." Pl. Exh. 55.

142.    Levin responded via email to Grecian that day: "Let me give some thought to your email, as you did, and get back to you, probably tomorrow."  Pl. Exh. 55.  Levin did not get back to Grecian until several weeks later, on December 12, 2011.  Pl. Exhs. 105, 106.

143.    The court finds that Grecian's stance regarding the fees was genuine.  Grecian is not a strategic emailer who conspired with Fishman to cheat Levin.  The court does not believe that Grecian would have sent his emails to Fishman had Grecian actually given his prior approval for a total twenty-five percent agent fee.  That Levin waited several weeks to respond to Grecian after October 27, 2011 strongly suggests that Levin realized that Grecian was correct and that Levin had not obtained Grecian's approval for a total twenty-five percent fee; if Levin thought that he had obtained Grecian's prior approval, he almost certainly would have responded to Grecian quickly rather than delaying for several weeks.

144.    On October 28, 2011, at Fishman's request, Levin sent Fishman two unsigned contracts for the purpose of giving Fishman a basis for retaining his ten percent fee upon leaving Sterling Lord for Gernert.  One contract was for Willingham's *Down the Mysterly River*, and the other was for Grecian's *The Yard* and its sequel, *The Black Country*.  The unsigned contract for *The Yard* stated in relevant part: "By our signatures below we memorialize the agreement we made in respect of an allocation of fees … [1.A.i]: you are entitled to Ten (10%) Percent of the gross amount of each 'Advance' and under the agreement as and between us, NightSky shall receive Five Percent (5%)."  Def. Exh. AA; Tr. 01/22/14.

145.    Levin sent this proposed contract *one day* after receiving Grecian's October 27, 2011 email expressing strong disagreement with Levin's suggestion that Grecian had agreed to pay Levin fifteen percent on top of Fishman's ten percent.  That Levin sent Grecian this proposed contract, with its "ten plus five" fee breakdown, provides yet further confirmation that

Levin had never reached a "fifteen plus ten" understanding with Grecian and that Levin understood that the fee breakdown truly was "ten (for Fishman) plus five (for Levin)."

146.    By November 7, 2011, Grecian still had not heard back substantively from Levin regarding October 27, 2011 email, and informed Fishman of such. Fishman told Grecian that Levin was still involved in the Putnam contract negotiations, and that it "currently stands that the money will go 10% to Gernert and 90% to NightSky, where Ken disburses it to you according to whatever agreement you have." Pl. Exh. 57.

147.    On December 1, 2011, Grecian complained to Fishman that it had been five weeks since his October 27, 2011 email, and said that he just wanted to get the Putnam contract signed "before [he] deal[t] with that situation [referring to the fees issue]." Fishman responded that Levin had been similarly unresponsive with him, but had recently indicated that he had the flu and would get back to Fishman soon. Def. Exh. EE.

148.    On December 12, 2011, Grecian emailed Levin with the subject line, "Why so long?" Grecian wrote: "I haven't heard from you in more than six weeks [since the October 27, 2011 email]. … I'm more than a little worried that I've been forgotten over here. I would like to have my contract with Putnam completed by the end of this week and I really can't see any reason why that shouldn't be possible." Pl. Exh. 105.

149.    The same day, December 12, 2011, Levin called Grecian, but Grecian missed the call. On December 13, 2011, Grecian emailed Levin to tell him that he was available to talk that day. Pl. Exh. 106; Tr. 01/27/14.

150.    Levin did not call Grecian back that day or any day thereafter. Tr. 01/27/14.

151.    The court finds Levin's testimony that he had obtained Grecian's approval of a "fifteen plus ten" fee breakdown— fifteen percent to Levin and ten percent to Fishman—

inconsistent with his behavior in response to Grecian's two emails of October 18, 2011, and October 27, 2011. As for the October 18, 2011 email, instead of emailing Grecian back to tell him that they had already agreed on a "fifteen plus ten" fee arrangement, Levin called Grecian and told him that he would fly to Kansas City three days later to meet with him. As for the October 27, 2011 email, Levin one day later sent Fishman a draft contact setting forth a "ten plus five" fee arrangement—strongly suggesting that Levin realized that Grecian was correct. Levin further undermined his credibility by falling radio silent after October 27, 2011 and not responding to Grecian's email for six weeks, when he easily could have sent an email or made a phone call to remind Grecian of their (supposedly) agreed-upon "fifteen plus ten" arrangement.

152. On December 21, 2011, Grecian, through his counsel, Bernard Rhodes, sent a letter to Levin terminating the Agreement. The letter asserted that Levin had "utterly failed to promote [Grecian's] work over the last seven years." Pl. Exh. 2.

153. On March 4, 2013, Grecian sold to Putnam the rights to a short story, to be published as an e-book, with some of the same characters and settings as *The Yard* series. Pl. Exh. 143. (The e-book is not considered an official sequel to the *The Yard*.) On June 13, 2013, the third and fourth books in *The Yard* series (the second and third sequels to *The Yard*) were sold to Putnam for $500,000, with the possibility of the advance increasing if *The Black Country* met certain sales performance metrics. Pl. Exh, 144; Tr. 01/24/14.

154. Through the date of trial, Grecian has received the amounts set forth in Pl. Exhs. 146-47 for the sale of the North American and certain foreign rights to *The Yard* and its sequels. Doc. 87 at p. 5 ¶ 61. The foreign rights, with the completed deal dates and amounts, include the U.K. rights to the *The Yard* and *The Black Country* (June 6, 2011; $79,152.73); the Russian (June 17, 2011; $3,000), Hebrew (July 7, 2011; $2,000), Japanese (March 9, 2012; $5,000), and

Polish (May 30, 2012; $6,000) rights to *The Yard*; and the U.K. audiobook rights to *The Yard* (November 11, 2011; $3,060.80) and *The Black Country* (August 5, 2012; $3,174.60). Pl. Exh. 147.

155. Fishman has continued to serve as Grecian's literary agent through at least the date of trial. *Id*. at p. 5 ¶ 60.

156. Levin has not received any fees from Grecian under the Agreement for *The Yard* or its sequels. *Id*. at p. 5 ¶ 62.

### L. Whether Levin Was Grecian's Agent, Manager, or Both

157. The parties spent much effort, including presenting two experts, on the question whether Levin acted as Grecian's manager or his agent; Levin says he was merely Grecian's manager, while Grecian says that Levin was his agent.

158. The answer to this question is immaterial to the outcome of this case, as none of the contractual issues discussed below turns on whether Levin was an agent or a manager. That said, the court finds that Levin acted as Grecian's agent, or as both his agent and manager.

159. The Agreement itself does not address this issue explicitly. Paragraph 1 does say, however, that "[Grecian] has designated [Levin] as the sole and exclusive representative of all of the rights to the Properties." Pl. Exh. 1 at ¶ 1. Because an agent is a type of representative, and because the Agreement makes Levin Grecian's "sole and exclusive representative," the best reading of the Agreement is that Levin was Grecian's agent.

160. Paragraph 8 says that Levin "may from time to time recommend the *strategic* retention of a *particular* agent … in respect of a Property or potential Property acquirer." *Id*. at ¶ 8 (emphasis added). The qualifiers "strategic" before "retention" and "particular" before "agent" strongly suggest that Levin was Grecian's all-purpose agent whose efforts would be

supplemented in specific situations with another, specialized agent who would help Levin deal with particular circumstances.

161.     Also, Levin performed agent-like tasks for Grecian, such as pitching works to and negotiating deals with publishers, throughout their relationship.  At trial, Levin admitted that he performed functions for Grecian that a literary agent would perform.  Tr. 01/22/14.

162.     Finally, Levin routinely referred to himself as an agent over the course of his and Grecian's relationship.  Pl. Exh. 85 ("The book goes up for auction tomorrow morning from my lit co-agent, David Gernert's agency (David handles John Grisham)."); Pl. Exh. 148 at 8 ("And through NightSky Entertainment, Levin works with the best and the brightest creators in the comics industry on new publishing projects, including … Alex Grecian (*Proof*) ….  Acting as developer, editor, agent, and manager specialist in comic art rights, Levin transitions on a daily basis between the worlds of publishing and Hollywood."); Def Exh. N ("Josh of Ch[e]rnin has kept calling Gernert Co. to talk to my co-agent."); Def. Exh. T ("I'd love to hook her up with Seth Fishman, my co-agent for THE YARD …."); Def. Exh. Z ("Seth Fishman and I are co-agents on a handful of projects for writers I manage, he usually taking lead on the fiction (**The Yard** auction was ours …), and I on the non-fiction.").

163.     Given the foregoing, the court credits the testimony of expert witness Donald Maass, who opined that Fishman and Levin were co-agents.  Tr. 01/24/14.  Given all of the evidence presented, the court also finds credible Maass's opinion that when two agents work as co-agents, they split the fifteen percent agent fee.  Tr. 01/24/14.  And for the same reasons, the court finds unpersuasive the testimony of expert witness Paul Levine, who opined that Levin was a manager only.  Tr. 01/24/14.

## Conclusions of Law

As noted, Levin seeks a declaratory judgment that the Agreement is a valid and enforceable contract and that, as a result, Grecian owes him fifteen percent of the money Grecian received for the rights to publish *The Yard* and its sequels. Levin also seeks damages for Grecian's alleged anticipatory breach of the Agreement. Doc. 68 at ¶ 114; Doc. 106-1. Grecian's counterclaims seek a declaratory judgment either that Levin's alleged breach of the Agreement terminated Grecian's obligations thereunder, including any obligation to pay Levin a fee, or, in the alternative, that Levin is entitled only to a five percent fee as Fishman's co-agent. Doc. 8 at pp. 15-17. Because the Agreement has no choice-of-law provision, and because neither party has raised a conflict of law issue, Illinois law governs. *See Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 729 (7th Cir. 2014) ("Because the district court was sitting in diversity, it was obligated to apply the substantive law of the forum state."); *Fednav Int'l v. Cont'l Ins. Co.*, 624 F.3d 834, 838 (7th Cir. 2010) ("When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits.") (internal quotation marks omitted). The parties have stipulated that the Agreement constitutes a written contract, Doc. 87 at p. 5 ¶ 4, and so the court finds this as a matter of law. *See Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007) ("The question of the existence of a contract is a matter of law for determination by the court.").

## I. Whether Levin Materially Breached the Agreement

"Under Illinois law, a breach of contract claim has four elements: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) a breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Hess v. Bresney*, 784 F.3d 1154, 1158-59 (7th Cir. 2015) (internal quotation marks omitted); *see also Hammarquist v. United Cont'l*

*Holdings, Inc.*, 809 F.3d 946, 949 (7th Cir. 2016) ("To prevail on a breach of contract claim in Illinois … the plaintiffs must show that there was a contract between the parties, and that [Defendants] breached the contract by failing to adhere to its terms.").  A "party cannot sue for breach of contract without alleging and proving that he has himself substantially complied with all the material terms of the agreement," and so "a material breach of a contract will excuse the other party's performance."  *Costello v. Grundon*, 651 F.3d 614, 640 (7th Cir. 2011) (internal quotation marks omitted); *see also Burford v. Accounting Practice Sales, Inc.*, 786 F.3d 582, 587 (7th Cir. 2015) ("[U]nless the parties provide otherwise, *any* contract is terminable upon the occurrence of a material breach.") (internal quotation marks omitted).  Thus, the question here is whether Levin indeed breached the Agreement and, if so, whether the breach was material.

"[U]nder Illinois law, the materiality inquiry focuses on two interrelated issues: (1) the intent of the parties with respect to the disputed provision; and (2) the equitable factors and circumstances surrounding the breach of the provision."  *Elda Arnhold & Byzantio, LLC v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 700 (7th Cir. 2002) (collecting cases).  To determine whether a breach is material, the court must ask "whether the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it."  *Ibid.* (internal quotation marks omitted).  "In other words, [the court] ask[s] whether the performance of that provision was a *sine qua non* of the contract's fulfillment."  *Ibid.* (internal quotation marks omitted).

## A.     Best Efforts Obligation

Grecian first argues that Levin breached his duty to use his best efforts to promote and sell Grecian's work.  The Agreement does not refer to any "best efforts" duty explicitly, but ¶ 1 makes Levin "the sole and exclusive representative of all of the rights to the Properties."  FOF

¶ 6.  That provision brings this case within the scope of *Wood v. Lucy, Lady Duff–Gordon*, 118 N.E. 214 (N.Y. 1917) (Cardozo, J.), which read an implicit duty on the part of an exclusive representative "to use reasonable efforts to bring profits and revenues into existence," *id*. at 214. "Without an implied promise, the transaction cannot have such business efficacy as both parties must have intended that at all events it should have." *Ibid*. (internal quotation marks omitted).

"The doctrine announced in *Wood v. Lucy* is the law of Illinois." *Bonner v. Westbound Records, Inc.*, 394 N.E.2d 1303, 1309 (Ill. App. 1979). "The common law interpolates a best-efforts clause into an exclusive distributorship contract silent about best efforts," *TMG Kreations, LLC v. Seltzer*, 771 F.3d 1006, 1012 (7th Cir. 2014) (citing *Wood*, 118 N.E. at 215), thereby "protect[ing] the seller from the dealer's exploiting the position that the exclusivity conferred (because it has eliminated competition from other dealers) by failing to promote the seller's product vigorously." *Classic Cheesecake Co., Inc. v. JPMorgan Chase Bank, N.A.*, 546 F.3d 839, 846 (7th Cir. 2008) (citing *Wood*, 118 N.E. at 214); *see also In re XMH Corp.*, 647 F.3d 690, 696 (7th Cir. 2011) ("[T]he 'best efforts' duty of an exclusive distributor is a familiar example of a contract default rule: the assumption is that a seller would not grant an exclusive distributorship without requiring the distributor to use his best efforts to promote the seller's brand, so in the absence of an express provision to the contrary a best-efforts requirement is read into every exclusive distributorship.") (citing, *e.g.*, *Wood*, 118 N.E. at 214-15).

The court concludes that Levin complied with his best efforts obligation. Early in their relationship, Levin intervened on Grecian's behalf with Young and Rosenheim at AiT/Planet Lar, resulting in the sale of *Seven Sons*, which Young and Rosenheim indicated would not have occurred otherwise. FOF ¶¶ 17-19. Although this sale's financial benefit to Grecian was relatively small ($1,000), small is not nothing, and no evidence was presented suggesting that

there were or should have been prospects for a more lucrative sale. In addition, in Grecian's own estimation, *Seven Sons* was well-received in the comics industry, helping bring him to the attention of larger comics imprints. FOF ¶¶ 21-23.

Levin also worked to try to sell a television option for *Proof* to Sony Animation, enlisting Jason Netter and Kickstart to aid the effort. FOF ¶ 25. When Grecian expressed frustration with the lack of progress, Levin was responsive and apologetic, and promised to work more diligently for Grecian. FOF ¶¶ 26-28. While Sony ultimately did not move forward with the *Proof* deal, and Levin resisted Goldworm's overtures, Grecian continued to channel all business dealings through Levin and acknowledged that Levin had "most definitely put in a lot of time on this project." FOF ¶¶ 33-34.

As to *The Yard*, Levin included Grecian's proposal in the initial batch of Graphic Novel Initiative pitches, actively revised (and proactively followed up on his revisions of) the proposal for *The Yard*, and, along with Fishman, met with four major publishing houses to pitch the proposal. FOF ¶¶ 43-44, 48, 52. Levin was also integral to the ultimate sale of *The Yard*: he rightly intuited that *The Yard* would be salable as a prose novel and persuaded a resistant Grecian that this was the best course of action. FOF ¶¶ 50, 52. Levin likewise correctly advised Grecian to reject Mulholland's $10,000 offer for the rights to the *The Yard*, even though Grecian initially wanted to accept it. FOF ¶ 69. In so doing, Levin expressed concern not only about the value of *The Yard*, but also about what accepting a low offer would mean for Grecian's career over the medium and longer term. FOF ¶ 69.

Levin also spearheaded the attempted sale of media rights related to *The Yard*. Although, as discussed below, Levin's efforts in this regard violated ¶¶ 3 and 4 of the Agreement, they did not violate his best efforts obligation. Levin probed three major media producers for their

interest in *The Yard* and, when Sony expressed interest, continued to pursue a deal. FOF ¶¶ 82, 85. During the course of the Putnam negotiations, he ensured that Grecian retained the graphic novel rights for *The Yard*, even when Putnam asked to include them in the contract for the prose novel; pushed for milestones so that Grecian would receive his money earlier; and negotiated and advised Grecian on foreign publishing deals for *The Yard*. FOF ¶¶ 94-95, 109-10.

All of this evinces Levin's "reasonable efforts," *Wood*, 118 N.E. at 214, "to promote [Grecian's work] vigorously," *Classic Cheesecake*, 546 F.3d at 846. The evidence shows that Grecian himself recognized this. After all, he noted that Levin and Fishman had "earned the hell out of their commissions," and, further, he recommended Levin's services to a friend in September 2011. He would not have done so had he truly been dissatisfied with Levin's efforts at that juncture. FOF ¶¶ 101, 124.

**B.      Paragraphs 3 and 4**

As noted, ¶ 3 of the Agreement provides that Levin and Grecian "shall keep each other informed of any and all inquiries and discussions respecting the Properties and the rights to the Properties," and that "[e]ach agrees to let the other know of any inquiries and any potential or actual opportunities learned of related to any of the Properties." FOF ¶ 8. In violation of this provision, Levin did not inform Grecian about the initial four film scout inquiries for *The Yard*, about the interest that Block expressed on Goldsman's behalf, or about the additional inquiries that Levin received while Sony was considering a media deal. FOF ¶¶ 83, 89, 92-93.

Likewise, ¶ 4 provides that "[n]o agreements for any of the Rights to the Properties or for any Services shall be entered into unless expressly approved by Alex in advance." FOF ¶ 9. In violation of this provision, Levin, without obtaining or even seeking Grecian's prior approval, granted Sony a free two-month option on exploring a deal for *The Yard* despite significant

interest from other media organizations, including Chernin. FOF ¶¶ 85-88, 93. By tying up the rights with Sony—which two years earlier had engaged Levin in a discussion about *Proof*, causing him to reject Goldworm's interest, but ultimately did not pursue a deal, FOF ¶¶ 25, 29-31—without Grecian's permission, and by not informing Grecian of the other interest in *The Yard*, Levin breached ¶ 4.

The breaches of ¶¶ 3-4 were material insofar as they persisted or occurred after the May 12-13, 2011 auction netted Grecian $500,000 for *The Yard* and a sequel. That was a particularly critical time, given that *The Yard* and its sequel had just been sold for a very large sum, and it was important for Grecian to strike the media market while the iron was hot. As noted above, to determine whether a breach is material, the court must ask "whether the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it," or "[i]n other words, … whether the performance of that provision was a *sine qua non* of the contract's fulfillment." *Elda Arnhold*, 284 F.3d at 700 (internal quotation marks omitted). That perfectly describes the question of Grecian's knowledge of media rights inquiries, granting of media rights options, and approving media rights deals during that critical period of time. *See Mary Ellen Enters. v. Camex, Inc.*, 68 F.3d 1065, 1067-68 (8th Cir. 1995) (affirming a breach of contract judgment against a literary agent who failed to inform the author of a distributor's additional interest in and purchase of copies of the book); *see also United States v. First Nat'l Bank of Cicero*, 857 F.2d 1362, 1370 (7th Cir. 1992) (acknowledging the possibility that "the Bank's retention of additional collateral for the … loan without informing the [Small Business Administration] of this fact" could "reasonably be viewed as constituting a material breach" of contract); *Blackburn, Nickels & Smith, Inc. v. Nat'l Farmers Union Prop. & Cas. Co.*, 482 N.W.2d 600, 604-05 (N.D. 1992) (holding, in the context

of a contract with an express provision obligating one party to keep the other informed, that "Rued's failure to keep Aetna informed constituted a material breach of its duties under the agency agreement").

Levin's material breaches did not by themselves terminate the contract. The Seventh Circuit has noted that "any contract is terminable"—not terminated—"upon the occurrence of a material breach. " *Burford*, 785 F.3d 582 (emphasis omitted). Grecian and Levin continued to perform and behave as if the Agreement governed their relationship, with Levin negotiating the foreign rights and (sporadically) the Putnam contract for *The Yard*, and Grecian continuing to seek and accept Levin's guidance. What Levin's material breaches did provide, however, are grounds for Grecian's valid termination of the contract through Rhodes's December 21, 2011 letter. FOF ¶ 152. At that time, Grecian may not have been aware of Levin's breaches of ¶¶ 3-4, as the letter charged only Levin's failure to use his best efforts on Grecian's behalf. *Ibid*. But the letter nevertheless validly terminated the Agreement based on Levin's breaches of ¶¶ 3-4 because, "[i]f the legal excuse for nonperformance exists at the time of termination, the terminating party may rely on the excuse in a breach of contract action even though he was unaware that the excuse existed at the time her terminated." *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1013 (7th Cir. 1985) (citing *College Point Boat Corp. v. United States*, 267 U.S. 12, 15-16 (1925)); *see also Israel v. Nat'l Can. Corp.*, 658 N.E.2d 1184, 1191-92 (Ill. App. 1995) ("Under Illinois law, a party may justify an asserted termination, rescission, or repudiation of a contract by proving that there was, at the time, an adequate cause, although it did not become known to him until later."). Because Levin's breaches had already occurred by the time Grecian sent the termination letter, Grecian was

entitled to terminate the Agreement, and his letter validly did so. As of December 21, 2011, the Agreement was no longer effective.

During closing arguments, Levin contended that Illinois's "mend the hold" doctrine precludes Grecian from relying on his material breaches of ¶¶ 3-4 to defend against Levin's contract claim or to support Grecian's declaratory judgment counterclaim. Tr. 01/28/2014. The reason, Levin explained, is that although Grecian's responsive pleadings (his affirmative defenses and counterclaims) alleged that Levin had materially breached the Agreement, the only breach specifically mentioned was of Levin's best efforts obligations. Levin's premise is correct: Grecian's responsive pleading does not specifically mention ¶¶ 3-4, let alone allege that Levin breached those provisions. Levin's conclusion, however, is incorrect, as the "mend the hold" doctrine does not prohibit Grecian from asserting Levin's material breach of ¶¶ 3-4 as a defense to Levin's claim and as a justification for terminating the Agreement.

In *Ryerson Inc. v. Federal Insurance Co.*, 676 F.3d 610 (7th Cir. 2012), the Seventh Circuit observed that the "mend the hold" doctrine "forbids the defendant in a breach of contract suit … to change its defenses in the midst of the suit, at least without good reason to do so." *Id.* at 614. Just three months later, the Seventh Circuit explained that "the doctrine" not only does not "limit a defendant to defenses announced before a suit is filed," but also "does not prohibit *the addition* of a defense after suit is filed." *On-Site Screening, Inc. v. United States*, 687 F.3d 896, 899 n.2 (7th Cir. 2012) (emphasis added). That is precisely what Grecian did here: his responsive pleading specifically pleaded as a defense Levin's alleged breach of his best efforts obligation, Doc. 8 at pp. 11-17, and during the litigation he added as a defense Levin's breach of ¶¶ 3-4. The court will mention, though it is unnecessary to do so, that Grecian's addition of that specific defense fits comfortably within his broadly stated first affirmative defense: "Levin's

claims are barred by his own material breaches of the Agreement, which excused Grecian from any obligations under the Agreement." *Id*. at p. 11.

A separate and independent reason for rejecting Levin's invocation of "mend the hold" is that Grecian's reliance on ¶¶ 3-4 did not unfairly prejudice or surprise Levin. "When there is no prejudice to the opposing party, invoking the doctrine of mend the hold to bar a valid defense is overkill." *Ryerson*, 676 F.3d at 614-15; *see also Amerisure Ins. Co. v. Nat. Sur. Corp.*, 695 F.3d 632, 636-37 (7th Cir. 2012) (rejecting invocation of "mend the hold" upon concluding that "we doubt that [the parties invoking the doctrine] were unfairly surprised or prejudiced by the allegedly 'eleventh hour' assertion of the [additional defense] at litigation"); *First Bank & Tr. Co. of Ill. v. Cimerring*, 365 F. App'x 5, 8 (7th Cir. 2010) ("Illinois courts have held that the mend the hold doctrine cannot be applied absent a showing of detriment or unfair surprise."). Levin's compliance or lack thereof with ¶¶ 3-4 was the subject of discovery in this suit, Pl. Exh. 85; Def. Exhs. N, X-Y, BB; Levin Dep. at 137-146 (presented at trial on 01/22/2014), so Levin cannot plausibly assert that he was unfairly surprised by Grecian's reliance on those provisions at trial. Indeed, Levin had every opportunity to, and did, contest at trial the facts concerning whether he complied with ¶¶ 3-4.

## II. Levin's Entitlement to Commissions

Although Levin materially breached the Agreement, the question remains whether he is entitled to the commissions that he earned before Grecian's December 21, 2011 termination of the Agreement. Under Illinois law, Levin is entitled to those commissions only if the Agreement is a divisible contract, but not if it is indivisible.

"Generally, there cannot be recovery on an indivisible contract for partial performance thereof." *Candalaus Chi., Inc. v. Evans Mill Supply Co.*, 366 N.E.2d 319, 324 (Ill. App. 1977)

(internal citations omitted).  "[A] 'divisible contract,' using that term in its usual sense, 'differs in one respect only from other contracts—namely, that on performance on one side of each of its successive divisions, the other party becomes indebted for the agreed price of the division which is recoverable in spite of subsequent breach by the performing party.'"  *Kimco Corp. v. Murdoch, Coll & Lillibridge, Inc.*, 730 N.E.2d 1143, 1148 (Ill. App. 2000) (quoting 6 Walter H. Jaeger, *Williston on Contracts* § 861 (3d ed. 1962)).  "While there is not a precise test for contract divisibility, as a general matter a divisible contract is one in which both parties have divided up their performance into units or installments in such a way that each past performance is the rough compensation for a corresponding past performance by the other party."  *Id*. at 1147 (internal quotation marks omitted).  As the Seventh Circuit has explained, the "test is whether, had the parties thought of it, they would be willing to exchange the part performance irrespective of what transpired subsequently or whether the divisions made are merely for the purpose of requiring periodic payments as the work progresses.'"  *Fidelity & Deposit Co. of Md. v. Rotec Indus., Inc.*, 392 F.3d 944, 947 (7th Cir. 2004) (internal quotation marks omitted).  "[W]hether it is proper to regard the parts of each pair as agreed equivalents will usually depend on considerations of fairness.  This means that the parts of the pair must be of roughly equivalent value to the injured party in terms of his expectations with respect to the total agreed exchange."  *Ibid*. (internal quotation marks omitted).

The Agreement is a divisible contract.  The Restatement (Second) of Contracts provides a close analogy:

> A contracts with B to work for one year as a real estate salesman and to devote his full time to this work.  A is to receive half of the real estate commission on all sales that he effects.  A devotes full time to this work for ten months, but unjustifiably devotes only part time for the last two months.  A court may apportion the unpaid commissions earned by A into those earned during the first ten months and those earned under the last two months according to the formula

> stated in the contract and, if it finds that working full time for ten months and the commissions on the sales over those months are agreed equivalents, A can recover the unpaid commissions for those months under the contract. B then has a claim against A for damages for his failure to devote full time during the last two months.

Restatement (Second) of Contracts § 240 (1981). Like A, the real estate agent who contracted with B to sell B's properties for a fifty percent commission and breached their one-year contract after ten months, Levin contracted with Grecian to promote Grecian's works for a commission and materially breached the Agreement in granting Sony the free option and not informing Grecian of other media inquiries. Just as A is entitled to recover his unpaid commissions for the ten months that he performed, Levin can recover his unpaid commissions he earned prior to Grecian's December 21, 2011 termination of the Agreement. *Cf. Ginett v. Computer Task Grp., Inc.*, 962 F.2d 1085, 1098-99 (2d Cir. 1992) (acknowledging the possibility of recovery for partial performance of a divisible contract); *Harris v. Dial Corp.*, 954 F.2d 990, 993 (4th Cir. 1992) (same); *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1552 (Fed. Cir. 1992) (same). That is, Levin's work from November 2004 through December 21, 2011 is the "agreed equivalent" of the commissions on the book sales that occurred during that time frame. That is a fair result because those commissions are precisely what Grecian expected to pay under the Agreement, and thus are "of roughly equivalent value" to Grecian "in terms of his expectations" under the Agreement. *Fidelity & Deposit*, 392 F.3d at 947 (internal quotation marks omitted).

That said, Levin is entitled only to five percent, not fifteen percent, of Grecian's revenues from *The Yard* and *The Black Country*. Although ¶ 6B of the Agreement sets Levin's commission at fifteen percent, FOF ¶ 7, Grecian did not give "prior approval," as required by ¶ 8 of the Agreement, FOF ¶ 10, to Levin's retention of Fishman at a ten percent commission on top of Levin's fifteen percent. No documentary evidence exists of Grecian agreeing to a "fifteen

plus ten" deal, and as explained above, the court credits Grecian's testimony that he never agreed to that fee structure.

To reiterate some of the points made above, Levin's own behavior confirms that Grecian never agreed to that fee structure. Levin made only minimal effort to ensure that the Putnam contract included his preferred fee breakdown, reflecting his discomfort from his realization that he had not obtained Grecian's prior approval for the fee structure. FOF ¶¶ 118, 122. When Grecian emailed Levin on October 18, 2011, expressing his lack of clarity regarding the fees, Levin responded not by reminding Grecian of his supposed prior approval, but instead by flying to Kansas City on short notice to discuss the issue in person. FOF ¶¶ 128-31. And when Grecian then on October 27, 2011 emailed Levin expressing discomfort and objection to a "fifteen plus ten" fee structure, Levin responded only tersely initially ("Let me give some thought") and then not at all for several weeks. FOF ¶¶ 141-42. If in fact Levin had obtained Grecian's prior approval, there would have been no need to "give some thought," as his response would and should have been along the lines of: "What are you talking about? We agreed to fifteen plus ten." Further, the very next day, Levin sent a contract for *The Yard* and *Black Country* to Fishman—and that contract, *which Levin drafted*, had a ten percent fee for Fishman and five percent fee for Levin, not the "fifteen plus ten" structure for which Levin asserts he had already obtained Grecian's prior approval. FOF ¶¶ 144-45.

During closing arguments, Levin's counsel admitted that if Levin did not comply with ¶ 8, then Levin must pay Fishman a ten percent commission out of Levin's fifteen percent commission. Tr. 01/28/14. Because Levin did not obtain Grecian's prior approval for the "fifteen plus ten" fee structure, Levin did not comply with ¶ 8 of the Agreement, and he is entitled to only a five percent commission from the North American revenues of the *The Yard*

and *The Black Country*, with ten percent going to Fishman. And because, based on the evidence at trial, the total value of Grecian's North American revenues for those two books is limited to the $500,000 advance, Levin is entitled to $25,000 from those revenues.

Levin is also entitled to revenues from the deals for the Hebrew and Russian rights for *The Yard*, the U.K. rights for the *The Yard* and *The Black Country*, and the U.K. audiobook rights to *The Yard*. FOF ¶ 154. These deals closed on June 6, 2011 (U.K.; $79,152.73), June 17, 2011 (Russian; $3,000), July 7, 2011 (Hebrew; $2,000), and November 11, 2011 (U.K. audio; $3,060.80), all before the effective termination of the Agreement on December 21, 2011. FOF ¶¶ 109-110, 154. Fishman's testified that, under his and Levin's co-agent fee structure, Levin was entitled to 3.34 percent of the foreign rights, FOF ¶ 138. Because the foreign rights agreements themselves are silent on the distribution of the revenues due to Grecian's U.S. agents, and Levin adduced no contrary evidence, the court finds that Levin is entitled to a 3.34 percent commission on these foreign rights. The total revenue from these deals is $87,213.53, so Levin's commission is $2,912.93.

Although Pl. Exhs. 128 and 147 also reference revenue for the Polish and Japanese rights to *The Yard* and *The Black Country* and to the U.K. audiobook rights for *The Black Country*, FOF ¶ 154, Levin is not entitled to recover a commission from those sales. These deals were completed well after the December 21, 2011 termination: on March 9, 2012 (Japanese), May 30, 2012 (Polish), and August 5, 2012 (U.K. audio for *The Black Country*). Similarly, Levin is not entitled to any commission for the sales of the third and fourth books in *The Yard* series (*The Devil's Workshop* and *The Harvest Man*), the related e-book *The Blue Girl: A Short Story of Scotland Yard's Murder Squad*, or the unrelated short story *Unknown Caller*. Those deals were all completed after the December 2011 termination: March 4, 2013, for *The Blue Girl*; June 13,

2013, for *The Devil's Workshop* and *The Harvest Man* (both North American and U.K.); and

September 18, 2013, for *The Unknown Caller*, which in any event does not derive from *The*

*Yard*.  FOF ¶ 153.

Finally, Levin is entitled to a fifteen percent commission for the earlier sales of *Seven*

*Sons* and *Proof*, as these sales occurred in 2006 and 2007, prior to Levin's material breach and

Fishman's entrance as Levin's co-agent.  FOF ¶¶ 22, 24, 29.  Although Levin did not claim these

revenues at the time Grecian received them, Grecian has not argued waiver, laches, or estoppel,

and any such arguments are accordingly forfeited.  *See Batson v. Live Nation Entm't, Inc.*, 746

F.3d 827, 833 (7th Cir. 2014) ("[A]s the district court found, the musical diversity argument was

forfeited because it was perfunctory and underdeveloped."); *Milligan v. Bd. of Trs. of S. Ill.*

*Univ.*, 686 F.3d 378, 386 (7th Cir. 2012) ("[T]he forfeiture doctrine applies not only to a

litigant's failure to raise a general argument … but also to a litigant's failure to advance a specific

point in support of a general argument."); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir.

2010) ("We have made clear in the past that it is not the obligation of this court to research and

construct legal arguments open to parties, especially when they are represented by counsel, and

we have warned that perfunctory and undeveloped arguments, and arguments that are

unsupported by pertinent authority, are waived.") (internal quotation marks and alterations

omitted).  Because Grecian received $1,000 from *Seven Sons* and "less than" $20,000 from

*Proof*, FOF ¶¶ 22, 24, Levin is entitled to fifteen percent of $21,000, which is $3,150.

## Conclusion

For the foregoing reasons, the court finds that Levin materially breached the Agreement

and that Grecian's December 21, 2011 letter validly terminated the Agreement, but that Levin is

entitled to a five percent commission on the North American revenues for *The Yard* and *The*

*Black Country*, for a total of $25,000; a 3.34 percent commission on the sales of the Hebrew and

Russian rights for *The Yard* and certain U.K. rights for *The Yard* (print and audio) and *The Black*

*Country* (print only), for a total of $2,912.93; and a fifteen percent commission on sales of *Proof*

and *Seven Sons*, for a total of $3,150.  Accordingly, judgment is entered in favor of Levin and

against Grecian in the amount of $31,062.93.  Levin's declaratory judgment claim is thus granted

in part (as to the above-stated figures) and otherwise denied in part; Levin's claim for

anticipatory breach of contract is denied, as Grecian's termination of the Agreement was

justified; Grecian's declaratory judgment counterclaim that the Agreement is terminated is

granted in part (as to the Agreement's termination as of December 2011) and denied in part (as

to whether Grecian is relieved of *all* of his obligations under the Agreement); and Grecian's

declaratory judgment counterclaim that Levin is entitled at most to only a five percent

commission for publishing contracts as to *The Yard* and *The Black Country* is granted.

March 31, 2016

_____
United States District Judge